THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILLIE C. LEWIS, Defendant-Appellant.

First District (2nd Division)   No. 78-33

Opinion filed July 31, 1979.—Rehearing denied September 4, 1979.

Ralph Ruebner and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Iris E. Sholder, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE PERLIN delivered the opinion of the court:

After a jury trial defendant, Willie C. Lewis, was found guilty of murder (Ill. Rev. Stat. 1975, ch. 38, par. 9—1), two counts of attempt murder (Ill. Rev. Stat. 1975, ch. 38, par. 8—4), delivery of less than 30 grams of a controlled substance, namely heroin (Ill. Rev. Stat. 1975, ch. 56½, par. 1401(b)), attempt delivery of less than 30 grams of heroin (Ill. Rev. Stat. 1975, ch. 38, par. 8—4), possession of less than 30 grams of heroin (Ill. Rev. Stat. 1975, ch. 56½, par. 1402(b)), and possession of a stolen vehicle (Ill. Rev. Stat. 1975, ch. 95½, par. 4—103(a)). Judgment was entered on each verdict except the attempt delivery and possession of heroin findings. Defendant was sentenced to concurrent prison terms of 500 to 1000 years for murder, 50 to 100 years for each attempt murder, 5 to 15 years for delivery of heroin, and 1 to 3 years for possession of a stolen vehicle.

Defendant appeals presenting the following issues for review: (1) whether a warrantless search of defendant's house conducted after defendant had been arrested and removed from the premises was unlawful thereby requiring all evidence seized to be suppressed; (2) whether statements made by defendant to police were made voluntarily or were induced by the physical injuries defendant received at the time of his arrest; (3) whether the State sustained its burden of proving that defendant was advised of his rights under *Miranda v. Arizona* (1966), 384 U. S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, and that he knowingly and intelligently waived his rights; (4) whether defendant was found guilty beyond a reasonable doubt of attempt murder and murder; (5) whether defendant was denied his right to confront witnesses against him when he was not permitted to impeach their testimony with proof of prior inconsistent statements made by the witnesses; (6) whether the trial court erred in refusing to admit into evidence a prior consistent statement made by defendant to police; (7) whether the giving of attempt murder instructions subsequently held to be erroneous in *People v. Harris* (1978), 72 Ill. 2d 16, 377 N.E.2d 28, constituted plain error; (8) whether defendant was denied a fair trial when the trial court inadvertently read to the jury an instruction that had been submitted by the State but then withdrawn; (9) whether evidence of the criminal background and former drug addiction of a State's witness is admissible on direct examination; (10) whether the prosecutor improperly questioned defendant regarding the veracity of witnesses for the State; and (11) whether comments by the prosecutor during closing argument were improper and prejudicial to defendant.

We affirm.

On the evening of September 13, 1976, police officers James Duigan, James McKeon and Patrick Crowley were conducting a narcotics surveillance of a house at 6243 South Aberdeen, Chicago, Illinois. At approximately 8 p.m. Officer Duigan observed a man, identified as Jessie Hayes, go to the back door of the house and attempt to trade a stereo for a quantity of heroin. A voice inside stated that he would only give a lesser amount than requested and Hayes replied that he would have to check with his partners. Hayes left and when he came to the alley behind the house the officers stopped him and told him to make the trade. The officers remained in the alley behind a gate which was approximately 10 to 12 feet from the back door. The back door had a burglar gate and a porch approximately three feet by three feet with three stairs which led up to the back door. A porch light and lights in the alley were illuminated. Hayes went to the back door and told the person who answered (identified in court as defendant Willie C. Lewis) that he wanted to trade. As defendant opened the burglar gate, the officers came into the yard and

yelled "halt, police officers." Defendant denied that he heard anyone yell "police" and testified that he only saw Hayes and one other person with a gun pointed at him. Crowley reached the stairs first and as he did defendant fired several shots, one of which hit Crowley. Defendant then backed into the house and closed the door. Several other officers arrived at the house and defendant was arrested inside the house along with a woman, Bernadette Markham. At the time defendant was arrested he sustained physical injuries requiring 13 sutures to his head. Police conducted a search of the premises at the time of the arrest and seized two weapons that were in plain view. A second search was conducted by other police officers approximately two hours after the arrest, and several packets of controlled substance and paraphernalia were observed in plain view and seized. Defendant was charged by indictments with the murder of Patrick Crowley; the attempt murders of James Duigan and James McKeon; delivery, attempt delivery and possession of heroin; and possession of a stolen vehicle.

Prior to trial defendant filed a motion to suppress physical evidence recovered during the two searches on the basis that no warrant was obtained, no consent to search was given, and the second search was not incident to the arrest. The following evidence was adduced at the hearing on the motion:

Defendant testified that on September 13, 1976, he was with his common-law wife, Bernadette, at 6243 Aberdeen. Defendant lived in the two-story house part of the time and he also lived with Bernadette at 6730 South Shore Drive. The first floor of the house at 6243 Aberdeen had a kitchen, dining room, living room and two bedrooms, one of which had a trap door to the basement. The second floor had three bedrooms and a bathroom. When a man came to the back door and tried to sell a stereo, defendant saw a second man enter the yard and point a gun at defendant from a distance of four or five feet. Defendant saw no one else enter the yard and did not hear anyone yell "police." Defendant stood right inside the kitchen door and fired three or four shots toward the gun pointed at him from a .41-caliber revolver which he owned. Defendant then closed the door and laid the gun down. He was standing in the dining room on the first floor when he heard someone say "Get some help over here, this is the police." Two police officers came through the back door with their guns drawn and told defendant he was under arrest and to lie down on the floor. One officer was black and in uniform and the other was white and in plain clothes. Defendant could not recognize either officer or recall their height, weight, age or hair color. Defendant told the officers that someone was upstairs and that he did not shoot any police officer. Defendant testified that Jimmy Jones and Herman Everett were in the

house on the night in question, that he heard them upstairs 10 to 15 minutes before police arrived and he did not see them leave.

Defendant testified further that as he began to lie on the floor, the white officer struck him on the head with a gun. Several officers then came in and began kicking defendant and the next thing he knew he was in a police car. Defendant did not resist arrest or struggle and his physical condition prior to the incident was good. After the beating, defendant's right front tooth was broken, and he had cuts below both eyes and on his head. The cuts on the head required nine stitches. The police did not show defendant a search warrant and defendant gave no one permission to search the house.

Police officer Milton Battle testified that on September 13, 1976, at approximately 8 p.m. he entered the house at 6243 Aberdeen through the back door and he observed defendant and a woman. Battle told defendant to step out with his hands up, which he did, and then he told defendant to lie on the floor. Battle then entered a bedroom on the first floor because the woman said there was a gun on the bed and he found a .41 Smith and Wesson revolver in plain view on the bed. There were no lights on in the room but Battle had a flashlight lit. Battle did not observe any other persons or any packets of narcotics in the room.

Police officers John Herr, Thomas Manion, Gerald Dahlberg and John Howe testified that on September 13, 1976, they entered the premises at 6243 Aberdeen at approximately 10 p.m. with their guns drawn to assist the crime lab in locating evidence and firearms and to search for a second offender who may have been in the building. Herr entered the bedroom on the first floor and observed on the floor a clear plastic bag containing a brown powder suspected to be heroin. Herr recovered the heroin and inventoried it. Herr then searched with his gun drawn, the closets, crawl spaces and places where a man could hide but he found no additional persons. Herr prepared a report on the night of the incident but the report does not indicate where in the bedroom the packet was found. Manion testified that while he was looking in the hallway for a firearm he shined his flashlight into a heating duct and observed two clear packets of a tan powder suspected to be heroin. One packet was small and the other was large and contained several small packets. Manion recovered the items and inventoried them. Dahlberg entered the kitchen area and observed in plain view some bottles on the sink. One bottle contained pink pills believed to be a controlled substance. Dahlberg recovered the bottles and inventoried them. Dahlberg also recovered some money from the bathroom sink on the first floor. Howe went up to the second floor with his partner; he entered the bathroom and observed a hypodermic needle, syringe, pressure rope and telephone cord on the

toilet basin and several packets of what he believed to be heroin in the toilet. Howe recovered the items and inventoried them. Howe's partner recovered a packet of marijuana from the window sill in the middle bedroom. Howe testified that he tried to look for any evidence and for possible exits or hiding places on the second floor. Howe did not have a warrant.

Before the court ruled on the motion, defense counsel withdrew the motion in regard to the two guns recovered in plain view upon the initial search. The court denied the motion to suppress the evidence finding that exigent circumstances were present to justify the warrantless search and seizure of items in plain view. The court found that the officers were lawfully present for the purpose of protecting other officers and evidence because they had a reasonable belief that other persons might have been on the premises.

Prior to trial defendant also filed a motion to suppress statements he made to police officers and assistant state's attorneys on the basis that he was not advised of his *Miranda* rights, he did not waive such rights, and the statements were the result of physical, psychological and mental coercion. The following evidence was adduced at the hearing on the motion:

Police officers George Gaynor and David Barrios testified that on September 13, 1976, at approximately 8 p.m. they went to 6243 South Aberdeen to remove a prisoner, identified as defendant, from the scene and transport him to St. Bernard Hospital. Defendant had blood on his face and was handcuffed. The officers were instructed not to let anyone talk to defendant. At the hospital they put defendant in a cubicle in the emergency room. No one talked to defendant from the time they left the scene until they entered the cubicle. A nurse and an orderly entered the cubicle and then a doctor entered, and the officers stood outside the cubicle. Gaynor testified that while the doctor was still present, Investigator Quinn arrived and entered the cubicle. Barrios testified that Quinn did not arrive until after the female doctor had left; that Quinn stated he was going to advise defendant of his rights but Barrios could not hear Quinn or defendant speak; and that after Quinn left, a male, oriental doctor entered the cubicle. Quinn remained for a few minutes and then instructed Gaynor and Barrios not to let anyone talk to defendant, and when the doctor was finished, to transport defendant to Area 3 headquarters at 39th and California. The officers then transported defendant from the hospital to headquarters and put him in an interrogation room on the third floor. When they left the hospital defendant had bandages on his head and forehead. At headquarters, the officers stood guard outside the interrogation room. No one spoke to defendant after they left the hospital, and only Quinn entered the

interrogation room for a few minutes. No one threatened, beat or made promises to defendant.

Investigator Thomas Quinn testified that he was in charge of the investigation of the death of patrolman Patrick Crowley. Sometime after 8 p.m. on September 13, 1976, Quinn went to the scene of the crime and then went to St. Bernard Hospital where he observed defendant in a cubicle in the emergency room. At approximately 9:30 p.m. Quinn entered the cubicle, identified himself and read defendant his rights. A nurse and an orderly were present when Quinn entered. After Quinn read each right from a card, he asked defendant if he understood, and each time defendant replied affirmatively. Quinn asked defendant if he would waive his rights and make a statement, and defendant replied that he would. Defendant had blood on his face and forehead, but he seemed alert. A male doctor then entered the cubicle, and Quinn left. Quinn instructed officers Gaynor and Barrios to permit no one to speak to defendant and to transport him to Area 3 headquarters. When the officers arrived at headquarters Quinn told them to put defendant into an interrogation room and to stand guard and allow no police personnel into the room.

Quinn further testified that at approximately 11:25 p.m. he entered the interrogation room, identified himself and advised defendant of his rights. At this time defendant had a bandage on his head, his face was washed and there was swelling around his eyes. Defendant stated that he waived his rights and then he made a statement. Quinn terminated the interview when he learned that assistant state's attorneys Ficaro and Urso had arrived. Quinn did not threaten defendant with physical harm and did not make any promises. Defendant was cooperative, did not indicate a fear of additional physical harm and did not request an attorney at any time. Defendant acted alert and his answers were precise.

Dr. Sarah B. Cobbs testified that on September 13, 1976, at approximately 8:30 p.m. she treated defendant in the emergency room at St. Bernard Hospital. Defendant, who walked in with two uniformed policemen, had blood on his face and had head injuries. After an orderly, Carl Spacone, cleaned the wounds, Dr. Cobbs sutured the wounds. There were no fractures or signs of internal bleeding. Defendant's blood pressure was normal, but his respiratory rate was high, indicating excitement. Defendant was oriented and alert, and he received only nonnarcotic drugs, novocaine and tetanus toxoid. Dr. Cobbs had a conversation with defendant in which defendant said he had been beaten. Dr. Cobbs did not see any plainclothes policemen in the emergency room.

It was stipulated that if Carl Spacone and Mary McAlpine were called to testify, they would testify that on September 13, 1976, Spacone

was employed as an orderly and McAlpine was employed as a nurse at St. Bernard Hospital. They were working in the emergency room and were present when investigator Quinn entered the room and read rights from a card to defendant.

Investigator John Ridges testified that in the early hours of September 14, 1976, he was stationed outside the interrogation room in which defendant was being held. At approximately 2:30 a.m. Ridges escorted defendant to the bathroom and upon returning to the interrogation room, defendant asked Ridges what would happen to Bernadette. Ridges replied that he thought she would be charged with murder on accountability. Ridges did not know at that time that Bernadette had been released. Defendant then asked if they would let Bernadette go if he told them what really happened; Ridges replied that he could make no deals. When asked if he had been read his rights, defendant replied affirmatively, but Ridges advised defendant again, and defendant stated he understood. Defendant then stated that he and Bernadette were in the house, and that another man in the house had done the shooting and then he ran upstairs and escaped out a window. Ridges told defendant he did not believe the story because earlier Bernadette said that she and defendant were in the house alone and that the police were conducting a narcotics raid and had the house surrounded. Defendant then told Ridges that the police came into the building and beat him for no reason; Ridges replied that the officers reacted because one of their fellow officers had been shot and that perhaps they did overreact. Ridges and defendant then talked about the police in general and their activities including raids. Ridges did not threaten defendant, made no threats to harm Bernadette and made no promises to defendant. After Ridges spoke to defendant he had a conversation with assistant state's attorney Urso, and then he, Urso and another assistant state's attorney, Angarola, went into the interrogation room. Defendant gave an oral statement but refused to give a written statement. Defendant never requested an attorney. Ridges did not prepare a written report regarding the conversation with defendant, but he reported it orally to Quinn.

Michael Angarola and Joseph Urso, assistant state's attorneys assigned to the felony review unit, testified that on September 13, 1976, at approximately 11:30 p.m. they went to Area 3 headquarters after learning that a police officer had been killed. At approximately 3 a.m. investigator Ridges called Angarola and Urso, and the three of them entered the interrogation room in which defendant was sitting. Urso asked defendant how he had been treated, and defendant stated that at the time of his arrest he was struck by some officers but that since his arrest he had been treated well and had not been threatened or coerced. Angarola advised defendant of his rights, and after each right defendant stated that he

understood. Defendant stated that he had already been advised of his rights. Angarola asked defendant if he waived his rights, and defendant replied in the affirmative. Defendant gave an oral statement but when requested to give a written statement, defendant refused. Defendant did not request an attorney or ask to make a phone call. Defendant was responsive. Angarola conducted the interview, and it took approximately 15 minutes. Urso was not present throughout but officer Ridges was in the room the entire time.

Assistant state's attorney Ficaro testified that he did not hear anyone threaten or strike defendant or make any promises to defendant. Ficaro heard no conversation regarding Bernadette nor any request by defendant for an attorney. Ficaro did not speak to defendant.

Lucius Robinson testified that on September 15, 1976, he was a personal bailiff to Judge Pompey, and he observed defendant in the criminal courts building. Defendant had a bandage on his forehead, his eyes were red, his lips were swollen and his face was puffy. Defendant had a scar on the left side of his head, and his clothing had spots that looked like human blood.

Defendant testified that on September 13, 1976, at approximately 8:15 p.m. he was arrested at 6243 Aberdeen. A police officer told him to lie on the floor, and as he did, he was hit over the head with a gun and then kicked and beaten. Defendant did not know the names of the officers who beat him, and he could not describe them. Defendant tried to cover his face with his hands, and he did not recall anyone pulling his hands back to put handcuffs on him. Defendant could not recall the officers who took him to the hospital, but they did not handle him roughly or threaten him. He did not recall speaking to any policeman or doctor or being advised of his rights at the hospital. Defendant went to the police lockup and was placed in an interrogation room on the third floor. He was not threatened or beaten, and no one told him he would get an additional beating if he did not cooperate. Defendant was questioned by four persons in regular clothes. The first person, whom defendant could not name or describe, came in and said he wanted defendant to cooperate. Defendant said he wanted to call an attorney first, but the person said defendant did not need an attorney. The person then left, and a second person came in, told defendant to cooperate and made threats to beat defendant and to harm Bernadette. Defendant told the second person he wanted to call an attorney. The first person returned and asked defendant if he knew a Dale Hudson. Defendant then talked to Dale Hudson, who was his cousin, and told her to call an attorney. Hudson gave defendant a jacket because he was cold. After Hudson left, the first officer came in and asked defendant if he was ready to cooperate. Defendant stated that he should not talk without an attorney but that he would give a statement because he did not

want to get hurt any more. Defendant gave a statement and later gave a statement to the state's attorney. Defendant also asked the state's attorney if he could call an attorney, but he said it was not necessary.

Defendant testified further that he did not use drugs and that he gave a statement because he believed he would be beaten by police and was in fear of his safety. Defendant told police that as the policeman was running up to the stairs, defendant saw the gun and it frightened him so defendant shot him. Defendant was not asked to make a written statement. Defendant did not recall giving a statement to Quinn at the hospital or making a statement to Quinn at the station. Defendant denied telling the state's attorney that he had been treated well. Defendant was advised of his rights only after he made a statement.

Effie (Dale) Hudson testified that she was defendant's cousin and she saw defendant at Area 3 headquarters on September 14, 1976, at approximately 10:30 a.m. Hudson spoke to defendant and gave him a jacket.

Based on the foregoing evidence, the trial court denied defendant's motion to suppress. The court found that the force used to effectuate the arrest was reasonable, was not for the purpose of eliciting a statement, and that the effect of any contact had dissipated by the time defendant made any statements. The court found that defendant had knowingly waived his rights and that the statements were voluntarily made.[1]

Chicago police officers James Duigan and James McKeon testified that on September 13, 1976, they were conducting a narcotics surveillance at 6243 South Aberdeen, along with their partner, Patrick Crowley. All three were in plain clothes but carried police equipment (*i.e.*, guns, handcuffs, flashlights, radios). The building at 6243 Aberdeen was a two-story residence with alleys to the south and east; there was a "burned out" building behind the residence and a yard area between the two buildings which was enclosed by a fence that opened out to the south alley. A porch approximately three feet by three feet with three stairs, led to the back door; the back door had a burglar gate. Duigan positioned himself in the gangway between 6243 and 6241 Aberdeen, while McKeon stood behind the burned-out building and Crowley remained in the alley. Duigan observed a tall black man exit the gate to the south alley and he signaled to his partners. McKeon and Crowley questioned the man and then released him. Duigan returned to the gangway and he observed a shorter black man, identified as Jessie Hayes, approach the rear door of the house

---

[1] Prior to trial, defendant filed a motion to suppress statements he made at Cook County Jail. In January 1977 while defendant was incarcerated, police officers interviewed defendant pursuant to their investigation of the death of Bernadette Markham. Defendant was told that any information given would be confidential and not for defendant's trial. No force or threats were used, and defendant did not contact his attorney. The trial court granted the motion finding a violation of *Miranda*.

and ring the bell. Hayes was carrying a stereo. A porch light was turned on and an inside door was partially opened. Hayes then stated he wanted to trade the stereo for "half a spoon of P" or heroin. The voice inside said he would only give "two $20 bags of P" so Hayes said he would have to check with his partners. Hayes put the stereo down on the porch and left. The officers stopped Hayes in the alley and told him to go back and accept the deal. McKeon testified at this time he observed a man in a yard across the alley and he asked the man what he was doing.

Officers Duigan and McKeon testified further that as Hayes returned to the house they and Crowley crouched at the gate leading to the yard area. Hayes knocked, and told the person who answered that the deal was "okay." The voice Duigan had heard earlier told Hayes to get off the porch; Hayes went down one step and then the person inside began to open the burglar gate. As the gate was opened and the person identified as defendant bent down toward the stereo, Crowley said "let's go" and he pushed the alley gate open. The officers entered the yard, each yelling "halt, police officers." Crowley reached the stairs first and yelled "freeze." Crowley then motioned Hayes off the porch and as Hayes began to move Crowley shouted "Look out, he's got a gun." McKeon then saw defendant raise a gun and fire one shot. Duigan and McKeon heard a loud explosion, saw a flash and then saw Crowley fall backward to the ground. Duigan and McKeon both dived down and Hayes fled. Duigan testified that he told defendant to drop the gun and Duigan raised his weapon to fire but from his crouched position he could not fire because the banister was in the way. As the officers ducked, defendant fired two shots directly over their heads, then backed into the house and fired a fourth shot. Duigan asked McKeon to cover him while he went to call for assistance and McKeon fired two shots into the house. In their written report, Duigan and McKeon did not state that Crowley yelled "freeze" or that he motioned Hayes to get off the porch.

Duigan and McKeon testified further that other police officers then arrived at the scene. McKeon and two others carried Crowley's body to a squadrol. Duigan testified that he entered the house, saw 10 or 12 officers already there, and as three officers were helping defendant up off the floor, he pushed his way past them, grabbed defendant's arm and hit him on the head with a flashlight. McKeon testified that he heard Duigan yelling "you shot my partner." Some officers pulled Duigan away from defendant.

Jessie Hayes testified that on September 13, 1976, he and some friends were trying to sell a stereo but could not find a buyer so they decided to try "Willie's dope pad" at 6243 South Aberdeen. Hayes went to the back door; defendant put the porch light on and partially opened the door, but not the burglar gate. Hayes told defendant he wanted to sell the

stereo for some heroin, but defendant offered only two $20 bags. Hayes told defendant he would have to check with his partners, he put the stereo down on the porch and left. As Hayes walked out the gate, two police officers stopped him and asked what he was doing. Hayes told them he was looking for a friend, but a third officer related the conversation between Hayes and defendant. Crowley then told Hayes to go back and make the trade. Hayes went back into the yard, knocked on the door and told defendant he would take the two $20 bags. Defendant told Hayes to back up, which Hayes did, and then defendant unlocked the burglar gate. As defendant bent down to pick up the stereo, the three officers ran through the gate saying "hold it, police." Hayes stated it was 8 or 9 feet from the gate to the porch. Crowley reached the stairs, told defendant to freeze, and told Hayes to come down. Someone then said "look out, he's got a gun" and Hayes saw defendant raise a gun and fire it downward. Hayes heard someone say "Oh my God" and then he ran. As he ran out the gate Hayes heard more gunshots.

Hayes testified that he had previously been addicted to drugs, but he was not addicted on September 13, 1976. Hayes had "chipped", meaning to "get high", two or three times in 1976 and about two weeks prior to the shooting. At the time of trial, Hayes was on probation for unlawful use of a weapon and he had served 22 months in a penitentiary in Michigan for attempt breaking and entering.

James Carpenter testified that on September 13, 1976, he had been residing for a month at 6244 South Carpenter, which was across the alley from 6243 South Aberdeen. Carpenter noticed a lot of traffic and activity at the house in question. At approximately 7:30 p.m. on September 13, 1976, Carpenter was in front of his house, and he observed three police officers in plain clothes get out of an unmarked car and go to the alley behind his house. Carpenter went into his backyard and after some time passed he observed two of the officers apprehend a tall black man as he came out the gate at 6243 Aberdeen; a third officer came from the gangway but then went back. The officers then stopped a short black man, talked to him for a few minutes and then they all went back to the gate. The black man went through the gate and the officers crouched behind it. Carpenter then heard a knock on the door, then a screech and then the officers burst through the gate and one yelled "halt, police" very loudly. Carpenter heard footsteps on the stairs and then a gunshot. The black man came running out and then Carpenter heard two more gunshots and then another shot. The officers ran out of the gate and Carpenter heard one of them say "Oh my God they shot Crowley."

Jerome Gougisha testified that on September 13, 1976, he resided at 6236 South Aberdeen, which is across the street from the house in question. At about 8 p.m. he was looking out the front window of his

second floor apartment and he heard a shot. Gougisha saw a black man run from the alley, and then he heard two more shots, a pause and then another. Gougisha saw a white man use a radio and about 30 seconds later several police cars arrived. After the shots, Gougisha did not see anyone enter or leave 6243 South Aberdeen.

Officers Clark Campbell and Milton Battle testified that they responded to a radio call that an officer had been shot at 6243 Aberdeen. They went through the yard and observed Crowley's body. Campbell then went up on the porch and kicked the door in while Battle "covered him." The two officers entered the kitchen, heard voices in the next room and told the persons to come out with their hands raised. Defendant and Bernadette Markham, who were in the next room, were told to lie on the floor and Campbell asked defendant where the person who shot the officer was. Defendant said the man had gone upstairs; the woman agreed and said the gun was in the bedroom. Battle recovered a .41-caliber revolver from the bedroom. Other officers then arrived and Battle and Campbell went upstairs to look for the offender. They searched for 10 minutes using their flashlights and looking in the rooms and closets, but they found no one. When they returned, defendant and Bernadette had been taken out of the house.

Officer David Neligan testified that he and his partner, Michael Lupa, positioned themselves at the bottom of the stairs covering the windows while Campbell kicked the door open. They then followed Campbell and Battle into the house and Neligan observed defendant and a woman lying on the floor. Defendant yelled "he went upstairs." Neligan stood over defendant and the woman and his partner picked up a gun and bullets from a table in the next room. Other officers then came into the house. Neligan handcuffed the woman and he and Lupa began to leave with her when Duigan pushed past them yelling "you shot my partner." Neligan left and transported the woman to Area 3 headquarters.

Officer Charles Korzenowski testified that he and his partner transported Crowley's body to St. Bernard Hospital and that Crowley was pronounced dead on arrival.

Robert Reilley of the criminalistics division testified that he dusted the .41-caliber revolver for fingerprints and an impression was found on the cylinder and barrel. Frank Nicholson, a fingerprint technician, testified that he compared the impression from the gun with defendant's fingerprints and it was his opinion that the fingerprints on the gun were those of defendant. Joseph Celovsky of the firearms identification section testified that he test-fired the .41 revolver and compared it with bullet fragments recovered near the porch of the house at 6243 Aberdeen. It was his opinion that the fragment was fired from the .41 revolver. Richard Meyers of the criminalistics division testified that two bullet holes were

found in the wall of the burned-out building, one three feet from the ground and the other nine feet from the ground. The holes were in direct line from the rear door at 6243 Aberdeen.

Officers Dahlberg, Manion, Herr and Howe testified to substantially the same facts as they testified to at the hearing on the motion to suppress. Gerald Pazin, a police department chemist, testified that he tested the materials recovered and analyzed a total of 8.09 grams of marijuana and 7.34 grams of heroin.

Investigator Quinn testified that at approximately 11:15 p.m. on September 13, 1976, he advised defendant of his rights and defendant agreed to waive his rights and tell what had happened. Defendant then told Quinn that he was in the bedroom with Bernadette and he heard shots and people running; two other persons, Herman and Yago, were in the house; defendant walked out of the bedroom, found his gun on the floor and brought it back to the bedroom.

Officer Howe testified that Quinn gave him a search consent form signed by Bernadette Markham for 6730 South Shore Drive, apartment 1603. Howe went to the apartment and recovered documents bearing defendant's name and relating to a 1975 Buick automobile. It was stipulated that Craig Barteles owned a 1975 Buick, with a value greater than $150, which was stolen in St. Louis, Missouri, on April 29, 1976, and that he did not give defendant permission to take or use the automobile and he did not see it again until September 1976 when it was recovered by the Chicago Police Department.

William Melaniphy of the auto theft division testified that he recovered a 1975 Buick at 6243 South Aberdeen. The registration and the "public" vehicle identification number indicated that the vehicle was a 1964 Buick; the car was registered to defendant as a 1964 Buick, but the owner's copy of the registration indicated that it was a 1975 Buick. Joseph Ochenfeld, an officer at the auto pound, testified that the hidden vehicle registration number did not match the public vehicle registration number. Robert Reese found a scale and other items in the trunk.

Dr. Sarah Cobbs testified to substantially the same facts as testified to at the hearing on the motion to suppress statements made by defendant.

Defendant testified on his own behalf that he resided at 6730 South Shore Drive and occasionally at 6243 South Aberdeen. Defendant admitted possessing less than 30 grams of heroin with intent to deliver and testified that he was in business with others as a dope dealer and that he sold heroin. Defendant sometimes mixed the drugs himself, using a scale and putting the mixture into packets. Defendant did not use narcotics. Defendant also admitted possessing the stolen vehicle knowing it to be stolen.

Defendant testified that on September 13, 1976, he went to the house on Aberdeen to bring some drugs there. Jimmy Jones, Herman Everett and Bernadette were at the house that evening. A man named Jessie Hayes came to the door and asked to trade a stereo for "half a spoon" of drugs. Defendant did not know Hayes so he said that he would give only $40. Hayes said he had to check with his partners, and then left, which defendant thought was unusual. Defendant then went to get the money and a revolver because he thought Hayes was going to harm him. Defendant kept a loaded .41-caliber revolver because someone had fired at the house previously. Defendant agreed that selling drugs was a dangerous business.

Defendant testified that when Hayes came back, defendant opened the inside door and unlocked the padlock. He picked up his gun, holding it in front of him so Hayes could see it and then he opened the burglar gate. As defendant started to bend down he heard someone on the stairs, so he turned and looked. Defendant saw only two hands holding a gun pointed at him from a distance of about five feet. He did not see handcuffs or other police officers, and he did not hear anyone shout "police officers" or "freeze." Defendant thought he was about to be shot so he began firing. Defendant fired several times and as he did he backed into the house and then slammed the door. Defendant testified that the porch light was on at the time he fired the shots and that nothing was wrong with his eyesight and nothing obstructed his view toward the gate. After defendant went into the house some shots were fired into the house and then he heard someone yell to get help and "police." Defendant threw the gun down and stood in the dining room with his hands up. Someone then came through the door, pointing a gun at him, told him he was under arrest and to lie down on the floor. Defendant told officer Campbell that someone was upstairs. Defendant was then struck over the head and was beaten. Defendant was treated at the hospital and then taken to the police station. Defendant testified that he made a statement to investigator Quinn that he did not know who shot the officer; he admitted that the statement was not true but he made the statement because he was afraid to say that he shot the officer.

After hearing all the evidence, the jury found defendant guilty of all charges. The court entered judgment on all findings, except attempt delivery and possession of heroin.

## I.

Defendant initially contends that the warrantless search of the premises at 6243 South Aberdeen, which was conducted approximately two hours after defendant had been arrested and removed from the

premises, was in violation of the fourth amendment. Defendant contends that the trial court erred in denying his motion to suppress the items seized pursuant to the search.

The evidence adduced at the hearing on the motion to suppress revealed that at the time defendant was arrested, police officers searched the premises for a second offender because defendant had stated that other persons were on the second floor of the house. No other persons were found at that time; however, two weapons were observed in plain view and seized. Police secured the premises and then approximately two hours later, after defendant was in custody, search was conducted by several other officers with their guns drawn, and certain controlled substances and paraphernalia were observed in plain view and seized. No warrant had been obtained for the second search. The officers who conducted the search testified that they were instructed to assist the crime lab in gathering evidence, and they were told that a second offender might have been on the premises. The trial court found that there were exigent circumstances that justified the warrantless search.

Defendant does not question the legality of the initial entry and search by police. However, defendant contends that the second search cannot be justified as a search incident to his arrest and that there were no exigent circumstances to justify the warrantless search since no other persons were found after the first search of the house. The State contends that the search was necessary to protect the officers, to prevent the destruction of evidence and to prevent the concealment or escape of other persons.

■■ It is well established that the police may make a warrantless entry into private premises based on circumstances confronting them at the time of entry indicating that an emergency situation exists. (*People v. Kepi* (1978), 65 Ill. App. 3d 327, 329, 382 N.E.2d 642.) When the police come upon the scene of a homicide, they may make a prompt warrantless search of the area to determine whether there are other victims or suspects on the premises, and any items that are in plain view may be lawfully seized. (*Kepi*, at 330-31.) Defendant contends, however, that the search was unlawful, citing the recent United States Supreme Court opinion in *Mincey v. Arizona* (1978), 437 U.S. 385, 57 L. Ed. 2d 290, 98 S. Ct. 2408. In *Mincey* police officers conducted a narcotics raid on defendant's apartment during which a police officer was killed and defendant and other persons in the apartment were wounded. After the shooting, the officers searched the apartment for other victims and suspects. They did not search for or seize any evidence but merely guarded the premises. Within 10 minutes, homicide detectives arrived on the scene and conducted an extensive warrantless search which lasted for four days and resulted in the seizure of 200 to 300 items. The Supreme

Court held that the "exhaustive and intrusive" search was in violation of the fourth amendment. (437 U.S. 385, 389, 57 L. Ed. 2d 290, 298, 98 S. Ct. 2408, 2412.) The search did not fall within any of the well established exceptions to the warrant requirement of the fourth amendment, and the fact that a homicide had occurred recently (the so-called "murder-scene" exception) did not constitute an exception to the warrant requirement. The court found that all persons in the apartment had been located before the investigating homicide officers arrived and began the search. (437 U.S. 385, 393, 57 L. Ed. 2d 290, 300, 98 S. Ct. 2408, 2414.) Thus, the court found no exigent circumstances to justify the search, stating:

> "There was no indication that evidence would be lost, destroyed, or removed during the time required to obtain a search warrant. Indeed, the police guard at the apartment minimized that possibility. And there is no suggestion that a search warrant could not easily and conveniently have been obtained. We decline to hold that the seriousness of the offense under investigation itself creates exigent circumstances of the kind that under the Fourth Amendment justify a warrantless search." (437 U.S. 385, 394, 57 L. Ed. 2d 290, 301, 98 S. Ct. 2408, 2414-15.)

The court stated in a footnote that upon remand the court should resolve the question of to what extent, if any, the evidence found was permissibly seized under established fourth amendment standards. (437 U.S. 385, 395, n. 9, 57 L. Ed. 2d 290, 302 n. 9, 98 S. Ct. 2408, 2415 n. 9.) Justice Rehnquist noted in his separate opinion, concurring in part, that the question of what evidence would have been " 'lost, destroyed, or removed' " if a warrant had been obtained or was in plain view should be considered on remand. 437 U.S. 385, 406, 57 L. Ed. 2d 290, 309, 98 S. Ct. 2408, 2421.

It is true, as defendant contends, that the search in the case at bar cannot be justified as a search incident to a lawful arrest. However, the search can be justified under the emergency exception to the warrant requirement, which was recognized by the court in *Mincey* and which is recognized in Illinois. (See *Kepi; People v. Swansey* (1978), 62 Ill. App. 3d 1015, 379 N.E.2d 1279; *People v. Lovitz* (1976), 39 Ill. App. 3d 624, 350 N.E.2d 276, *cert. denied* (1977), 434 U.S. 842, 54 L. Ed. 2d 107, 98 S. Ct. 141.) Under the emergency exception, a warrantless entry and search is justified if the police officers reasonably believe that an emergency situation exists. The court in *Mincey* stated:

> " 'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.' [Citation.] And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities." (437 U.S. 385, 392-93, 57 L. Ed. 2d 290, 300, 98 S. Ct. 2408, 2414.)

In the case at bar the police officers testified that when they arrived at the house they were told that another suspect may be on the premises. The source of this suggested possibility was defendant himself. The officers conducted the search with their guns drawn, and they searched in closets and other places where a person could hide. Also, the officers seized only items that were in plain view and did not conduct an "extensive and intrusive" search as in *Mincey*. Although no other persons were found during the initial search at the time of defendant's arrest, this does not necessarily render unreasonable the officers' belief that there was another person on the premises two hours later and that there was a need to protect the lives of other police officers and to prevent the destruction of evidence. The officers' belief is supported by defendant's testimony and the testimony of the arresting officers that defendant had stated there was another person in the house. Also, defendant testified that there was a trap door in one of the bedrooms which led to the basement and there was no evidence to indicate that the police searched the basement during the initial search. Thus, we find that the record supports the trial court's finding that exigent circumstances existed which justified the warrantless search and the seizure of items that were in plain view.

## II.

Defendant next contends that statements he made to police were induced by the physical injuries he received at the time of his arrest and by the fear of further beatings. Defendant contends that the trial court erred in denying his motion to suppress the statements. The State does not contest the fact that defendant was injured at the time of his arrest; however, the State contends that the effect of any physical contact had dissipated by the time defendant made any statements.

The constitutional test for the admission of a confession is whether the confession was made freely, voluntarily and without compulsion or inducement of any sort. (*People v. Davis* (1966), 35 Ill. 2d 202, 220 N.E.2d 222.) The test for voluntariness is whether the defendant's will was overborne at the time he made a statement. (*Lynumn v. Illinois* (1963), 372 U.S. 528, 534, 9 L. Ed. 2d 922, 83 S. Ct. 917.) A confession obtained by force or brutality is not voluntary and is inadmissible. (*Brown v. Mississippi* (1936), 297 U.S. 278, 80 L. Ed. 682, 56 S. Ct. 461.) The determination of voluntariness is to be made by the trial court based on the totality of the circumstances (*People v. Johnson* (1970), 44 Ill. 2d 463, 256 N.E.2d 343, *cert. denied* (1970), 400 U.S. 958, 27 L. Ed. 2d 266, 91 S. Ct. 356), and its finding will not be disturbed on review unless it is contrary to the manifest weight of the evidence. *In re Lamb* (1975), 61 Ill. 2d 383, 336 N.E.2d 753, *cert. denied* (1976), 425 U.S. 938, 48 L. Ed. 2d, 96 S. Ct. 1672.

■ In the case at bar the trial court found that the force used to effectuate defendant's arrest was reasonable and not for the purpose of eliciting a statement and that the effect of any contact had been dissipated by the time defendant made any statements. A reading of the record supports the trial court's finding that based on a totality of circumstances the statements were voluntarily made. There was sufficient evidence that defendant was advised of his rights and that defendant was not threatened or beaten after the time of his arrest. Defendant alleges only a general fear of being beaten, but he admitted that he never saw the same officer who hit him after defendant left the scene of the crime, and he admitted to the assistant state's attorneys that after his arrest he was treated well. There was no evidence to show that defendant was beaten for the purpose of eliciting a confession, and there is no evidence which indicates that defendant's will was overborne.

■■ ■ Defendant also contends that the statements must be suppressed because the State failed to produce at the suppression hearing all material witnesses, in particular the officer or officers who beat defendant. It is well established that the burden is on the State to establish voluntariness of a confession by a preponderance of the evidence and that the State has a duty to produce all persons whose testimony would be material on the issue of voluntariness or to explain their absence. (*People v. Armstrong* (1972), 51 Ill. 2d 471, 475-76, 282 N.E.2d 712; *People v. Harper* (1967), 36 Ill. 2d 398, 401, 223 N.E.2d 841.) It is also clear that when a police officer is alleged to have beaten a defendant, his testimony is material whether or not he was present when the statement was actually made by defendant. (*Armstrong*, at 476; *People v. Delk* (1976), 36 Ill. App. 3d 1027, 1035, 345 N.E.2d 197.) However, it is also established that defendant must object in the trial court to the failure of the State to call all material witnesses, or defendant will be precluded from raising such issue on appeal. (Ill. Rev. Stat. 1975, ch. 38, par. 114—11(d); *People v. Slaughter* (1978), 59 Ill. App. 3d 159, 162, 376 N.E.2d 33; *Delk*, at 1035.) In the case at bar defense counsel made an objection during the hearing to the State's failure to call a police officer and an assistant state's attorney who were present at the time a statement was taken. Both persons were subsequently called by the State and no further objections were made by defendant. Thus, defendant has waived the issue for purposes of appeal.

Defendant further contests the findings of the trial court that defendant was not beaten for the purpose of eliciting a statement and that the statements made by defendant were voluntary. Although the actions of Officer Duigan and the alleged actions of other officers in inflicting the injuries upon defendant were regrettable and although this court cannot excuse nor condone the excessive force used since it appears to have been unnecessary to effectuate the arrest, we conclude that, based on the

totality of circumstances, the force used was not intended to elicit a statement and did not result in defendant giving a statement. Thus, we find that the trial court's findings are not contrary to the manifest weight of the evidence.

## III.

Defendant contends that the State failed to prove that defendant was advised of his *Miranda* rights and knowingly and intelligently waived such rights. Whether defendant understood his rights and waived them is a factual question. At a hearing to suppress a confession it is the trial court's responsibility to determine the credibility of the witnesses, and the competency of the confession and the trial court's decision will not be reversed unless it is contrary to the manifest weight of the evidence. (*People v. Clemens* (1972), 9 Ill. App. 3d 312, 292 N.E.2d 232; *People v. Johnson* (1969), 112 Ill. App. 2d 148, 251 N.E.2d 393.) In making its decision that defendant waived his rights and voluntarily made a statement, the trial court need not be convinced beyond a reasonable doubt. (*People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731.) It has been held that there is a sufficient showing of voluntariness and waiver where there is evidence that (1) the *Miranda* warnings were given; (2) defendant stated he understood his rights; and (3) defendant refused to give a written statement, thereby demonstrating an awareness of his rights and the ability to exercise them. *People v. Fultz* (1975), 32 Ill. App. 3d 317, 338-39, 336 N.E.2d 288, *appeal denied* (1976), 61 Ill. 2d 602; *Johnson*, at 156.

In the case at bar there is ample testimony which, if believed, supports the trial court's determination. Investigator Quinn testified that he advised defendant of his rights at the hospital, and this is corroborated by the nurse and orderly who were present. Quinn also testified that he advised defendant again at police headquarters, and defendant acknowledged each right and said he waived his rights. Officer Ridges and assistant state's attorneys Urso and Angarola testified that they advised defendant of his rights and defendant replied that he understood his rights and waived them. Defendant stated also to Angarola and Urso that he had previously been advised of his rights and he waived them. Ridges, Urso and Angarola also testified that defendant was asked to make a written statement but he refused. Based on this evidence, we find that the trial court's determination that the statements were voluntary is not contrary to the manifest weight of the evidence.

## IV.

Defendant next contends that the evidence did not establish that he was guilty beyond a reasonable doubt of attempt murder and murder.

It is well established that a reviewing court will not set aside a jury's verdict unless the evidence presented at trial is so improbable or so palpably contrary to the verdict as to raise a reasonable doubt of guilt. (*People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666.) The credibility of the witnesses and the weight to be given to their testimony and the inferences to be drawn therefrom are solely for the jury. (*People v. Harris* (1972), 53 Ill. 2d 83, 288 N.E.2d 873.) Conflicts or discrepancies in the testimony do not destroy credibility, but rather go only to the weight to be given to such testimony. *People v. Beasley* (1977), 54 Ill. App. 3d 109, 114, 369 N.E.2d 260; *People v. Rogers* (1974), 23 Ill. App. 3d 115, 119, 318 N.E.2d 715.

## A.

Defendant contends that he was not proved guilty beyond a reasonable doubt of attempt murder because the State failed to prove he had the specific intent to kill when he fired the shots.

It is established that the essence of attempt murder is a specific intent to take human life. (*People v. Harris* (1978), 72 Ill. 2d 16, 377 N.E.2d 28.) Since proof of defendant's intent to kill can rarely be based on direct evidence, such intent may be established from the surrounding circumstances, including the character of the assault and the use of a deadly weapon. (*People v. Woods* (1978), 62 Ill. App. 3d 381, 385, 378 N.E.2d 1271; *People v. Jones* (1977), 55 Ill. App. 3d 446, 451, 370 N.E.2d 1142.) It has been held that a person who fires a gun " 'at or toward' " another, either with malice or total disregard for human life, may be convicted of attempt murder. *Woods*, at 385, and cases cited therein.

In the case at bar the State's evidence showed that defendant was standing on a porch three feet above the ground when the police officers ran into the yard toward the porch and yelled "halt, police." Defendant fired one shot, which hit Officer Crowley from a distance of four to five feet, and then he paused and fired two shots at Officers Duigan and McKeon. The officers' testimony that they announced their office was corroborated by the testimony of Jessie Hayes and James Carpenter. The fact that there was a pause after the first shot was corroborated by Hayes, Carpenter and James Gougisha, and their testimony directly contradicts defendant's testimony that he fired the shots consecutively and without pause because he was in fear of being shot. Further, it was undisputed that the yard area was illuminated by a porch light and a light in the alley, that there was only 10 to 12 feet from the gate to the door where defendant was standing and that two bullets fired from defendant's gun hit a wall approximately 12 feet away. One bullet hit the wall three feet above the ground and the other hit seven feet above the ground. We find that a specific intent to kill is established by defendant's conduct of firing

a gun "at or towards" the police officers from a distance of less than 12 feet after the officers had announced their office. Further, we find that the cases cited by defendant are distinguishable. In *People v. DeSavieu* (1973), 14 Ill. App. 3d 912, 303 N.E.2d 782, the court found that proof that defendant fired a gun twice at a tree and a branch fell to the ground was not sufficient to show specific intent to kill. However, the court also found that defendant did attempt murder when he stepped from behind a tree and shot at two persons, wounding both. In *People v. Henry* (1971), 3 Ill. App. 3d 235, 278 N.E.2d 547, the court held that the evidence was not sufficient to prove specific intent even though defendant shot toward police because the evidence that defendant was an ex-marine with an expert rating in marksmanship made it unlikely that defendant would have fired and missed his target. In contrast, we find that the evidence in the case at bar was not so improbable as to raise a reasonable doubt of guilt and was sufficient to support the finding of specific intent to kill.

B.

Defendant contends that he was not proved guilty beyond a reasonable doubt of murder because the State failed to prove he was not justified in using the force which he did. Defendant contends that he acted in self-defense when he fired the gun because he did not know the man in the yard was a policeman and defendant thought he was about to be shot.

The issue of self-defense is a question of fact and a judgment will not be reversed unless the evidence is so improbable or so palpably contrary to the verdict as to raise a reasonable doubt of guilt. (*People v. Rowe* (1977), 45 Ill. App. 3d 1040, 1045, 360 N.E.2d 436; *People v. Clemens* (1972), 9 Ill. App. 3d 312, 316, 292 N.E.2d 232.) In the case at bar there was substantial evidence, which if believed, would refute defendant's claim of self-defense. The evidence that the officers announced their office before any shots were fired was contradicted only by the testimony of defendant. There was also uncontradicted evidence that the area was lit and that Officer Crowley was shot from a distance of four to five feet. The conflicts in testimony pointed out by defendant in his brief are minor discrepancies that affect only the witnesses' credibility and are not of such magnitude as to create a reasonable doubt of guilt. (See *People v. Dees* (1977), 46 Ill. App. 3d 1010, 361 N.E.2d 1126, *appeal denied* (1977), 66 Ill. 2d 632.) Discrepancies in the evidence were questions of fact presented to the jury and it was the duty of the jury to resolve any conflicts. (*Yarbrough,* at 227.) Also, the facts that Hayes was an admitted user of narcotics and had a criminal record were matters to be considered by the jury in determining Hayes' credibility. (*People v. Lewis* (1962), 25 Ill. 2d 396, 399, 185 N.E.2d 168.) Based on the record as a

whole, we conclude that the evidence is not so improbable as to raise a reasonable doubt of defendant's guilt and that there is ample evidence to support the jury's finding of guilt for murder.

## V.

Defendant contends that he was denied his right to confront witnesses against him when he was not permitted to impeach the testimony of Carpenter with evidence of a prior inconsistent statement Carpenter made to police on the night of the shooting. Carpenter testified that after seeing the officers in the alley, he heard a knock at the door and then the three officers burst through the gate and one yelled "Halt, police"; Carpenter then heard one gunshot, then there was a pause and two more gunshots, then a black man ran from the yard and Carpenter heard a gunshot, a pause and two more gunshots. On cross-examination, defense counsel asked whether Carpenter told police on the night of the shooting that he heard "one loud shot, and then, about five shots in a row" and Carpenter replied that the statement did not sound like his. Defendant then offered the testimony of Officer Kehoe to impeach Carpenter's testimony regarding the gunshots. The State objected on the basis that no foundation for impeachment had been laid, and also the defense was actually using a report written by Investigator Quinn to impeach Carpenter. In the report Quinn stated that Officer Kehoe related to him a conversation Kehoe had with Carpenter in which Carpenter stated he heard one loud shot and then five quick shots. On an offer of proof Kehoe testified that Carpenter did state there was one loud shot followed by five shots in a row, but that he did not make a written report of the conversation; he reported it orally to Quinn. The court sustained the State's objection to the impeachment testimony.

■■■■ It is well established that before a witness may be impeached by a prior statement, a proper foundation must be laid in order to alert the witness and give the witness an opportunity to explain. (*People v. Rainford* (1965), 58 Ill. App. 2d 312, 317, 208 N.E.2d 314.) A proper foundation has two requirements: (1) the witness must be questioned as to the time, place and persons involved in the alleged conversation, and (2) the witness must be asked whether he made a certain statement at that time and be allowed to explain any apparent discrepancy between that statement and his statement at trial. *People v. Bounds* (1976), 36 Ill. App. 3d 330, 335-36, 343 N.E.2d 622.

In the case at bar defendant attempted to lay a foundation for impeachment by referring to Officer Quinn's report which summarized Carpenter's statement on the night of the shooting as told to Quinn by Kehoe. Carpenter did not deny making the statement but stated that it did not sound like his statement. Carpenter was not given an opportunity to

explain the substance of the alleged statement to police. Thus, a foundation for Kehoe's testimony was not laid.

■■ ■ Defendant impeached the testimony of Duigan and McKeon by evidence that they failed to mention certain facts in their written report (*i.e.*, the fact that Crowley motioned Hayes off the porch prior to the shooting). The officers testified that although the fact was omitted from their report, the report was only a summary and they had reported orally such fact to Quinn. Defendant was precluded, however, from questioning Quinn about the fact that his report did not include the facts allegedly related by Duigan and McKeon. What, in fact, the defendant was attempting to do was to impeach Duigan and McKeon with a report written by Quinn. However, it has been held that a police officer cannot be impeached by a report which he neither prepared nor signed. (*People v. Zazzetti* (1972), 6 Ill. App. 3d 858, 861, 286 N.E.2d 745.) Since the discrepancy between the trial testimony of Duigan and McKeon and the contents of their report was admitted into evidence before the jury, no prejudicial error resulted in limiting further attempted impeachment by use of Quinn's report.

### VI.

Defendant contends that the trial court erred in refusing to admit into evidence a prior consistent statement made by defendant to police after the shooting. Defendant attempted to elicit evidence that he told Investigator Ridges that he shot Officer Crowley in self-defense. Ridges' testimony at the suppression hearing reveals, however, that defendant initially told him some other person did the shooting and that after Ridges said he did not believe defendant and related statements Bernadette had made, defendant stated he did the shooting.

■■ It has been held that self-serving statements made by a defendant subsequent to the commission of a crime and after a motive to fabricate existed are not admissible. (*People v. Jones* (1962), 26 Ill. 2d 300, 186 N.E.2d 314.) The statement sought to be introduced by defendant in the case at bar was made approximately seven hours after defendant had been arrested and after defendant had made statements to Quinn that someone else did the shooting. Thus, there was sufficient motive to fabricate, and the court did not err in finding it to be inadmissible.

Defendant contends that the statement should have been admitted because the prosecution in opening and closing arguments stated that defendant contrived the claim of self-defense only when he had no alternative. In the opening statement the prosecutor stated only that defendant initially told police he did not know what had happened. In closing argument the statement complained of was made by the

prosecutor. However, there was no objection by defendant, and the alleged error cannot be raised for the first time on appeal.

## VII.

Defendant contends the trial court erred in instructing the jury regarding the mental state required to convict for attempt murder. Defendant contends that jury instructions substantially the same as those given in the case at bar were held to be erroneous in *People v. Harris* (1978), 72 Ill. 2d 16, 377 N.E.2d 28, because they did not state clearly that to convict for attempt murder nothing less than specific intent to kill must be shown. Although defendant did not object at trial to the instructions, defendant argues that plain error resulted and this court should reverse and remand. The State admits that under *Harris* the instructions were erroneous, but argues that the issue was waived by failure to object at trial.

The Supreme Court of Illinois recently held in *People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331, that although the attempt murder instruction was defective under *Harris*, defendant waived his right to assert such error on appeal by his failure to object to the instruction at trial. The court reasoned that although the waiver rule is not absolute, the exception of Supreme Court Rule 451(c), that substantial defects are not waived if the interests of justice require, is to be strictly construed. Rule 451(c) is a limited exception to be used to correct "grave errors," or to be applied where the case is close factually and fundamental fairness requires that the jury be properly instructed. (*Roberts*, at 14.) The court in *Roberts* found that the instructions did not constitute a "grave error" and the evidence in the case was not closely balanced. The court stated that the prior decision in *Harris* did not mandate a different conclusion because leave to appeal was granted in *Harris* to resolve the attempt murder problem and not to deal with the question of waiver.

As previously discussed in the section regarding reasonable doubt, the evidence in the case at bar supports a finding that defendant had specific intent to kill when he fired a gun at the officers from a distance of less than 12 feet. The evidence is not closely balanced on the issue of intent and thus, under *Roberts*, defendant has waived this issue for purposes of appeal.

## VIII.

Defendant next contends that prejudicial error resulted when the trial court inadvertently read to the jury an instruction that had been submitted by the State and then withdrawn.

During the conference on instructions the State submitted an instruction regarding the justifiable use of force by one who provokes the

use of force against himself. (See Illinois Pattern Jury Instructions, Criminal, No. 24.09.) Defendant objected to the instruction and it was withdrawn by the State. The court then inadvertently read the instruction to the jury along with 34 other instructions and 22 verdict forms. Defendant made a motion for mistrial alleging that prejudicial error had resulted form the court's reading of the instruction. The trial court denied the motion stating:

> "The Court does not feel that in reading these instructions any one instruction will stand out unless [the jurors] have an opportunity to read them."

The instruction in question was not submitted to the jury in written form when they went into the jury room to deliberate.

■■ It is well established that it is error to submit an instruction to the jury if there is no evidence to support the giving of the instruction. (*People v. Shackles* (1977), 44 Ill. App. 3d 1024, 358 N.E.2d 1329.) However, the State argues that the error here was harmless because the trial judge did not give to the jury the written instruction when they went into the jury room to deliberate. In *People v. Wilson* (1976), 43 Ill. App. 3d 583, 357 N.E.2d 81, the trial judge failed to read a tendered instruction and the record on appeal did not affirmatively show that the written instruction had been submitted to the jury in the jury room. The appellate court held that the failure substantially prejudiced defendant's right to a fair trial and thus constituted reversible error. Similarly, in *People v. Lewis* (1977), 53 Ill. App. 3d 89, 368 N.E.2d 619, instructions when read to the jury were incomplete in that they did not include modifications agreed to during the conference. The appellate court held the misreading to be reversible error because the instructions as read misstated the law and there was nothing in the record to show that the correct instructions were given to the jury in the jury room. The implication from *Wilson* and *Lewis* is that if the correct instructions had been submitted in written form to the jury in the jury room, a prior error in the reading of the instructions would have been cured and prejudicial error would not have resulted. In the case at bar, the error in the reading of the instructions was corrected by the submission of correct, written instructions to the jury in the jury room. Thus, we find that the inadvertent reading of the instruction in question was harmless error.

## IX.

■■■ ■ Defendant contends that the trial court erred in allowing the State to elicit testimony on direct examination that Jessie Hayes, a State's witness, had a criminal record and was an admitted user of narcotics and

a former addict. Defendant objected to the testimony, but then pursued such testimony on cross-examination. It has been held that where defendant objects to certain testimony on direct examination, but then questions the witness on cross-examination concerning the allegedly inadmissible testimony, any error is waived for purposes of appeal. (*People v. Jenkins* (1974), 20 Ill. App. 3d 727, 734, 315 N.E.2d 269; *People v. Calvin* (1969), 116 Ill. App. 2d 471, 481, 253 N.E.2d 922.) Further, defendant did not raise this issue in his post-trial motion and has thereby waived the issue for purposes of appeal. *Jenkins*, at 734.

We note, however, that in *People v. DeHoyos* (1976), 64 Ill. 2d 128, 355 N.E.2d 19, the court held that a party who calls a witness with a criminal record may prove the record on direct examination so as to reduce the prejudicial effect of the evidence on the witness' credibility. The court further held, however, that the admissibility of proof of a witness' criminal record may, as with many other types of evidence, depend on whether its probative value outweighs its prejudicial effect to the defendant. In the case at bar the evidence that Hayes used narcotics and was a former addict did not prejudice defendant because defendant admitted to selling narcotics, and the attempted deal with Hayes was an integral part of the case. The evidence that Hayes had a criminal record did not reflect upon defendant since the crimes did not in any way involve defendant. (Compare *DeHoyos*.) Thus, admission of the evidence in question did not constitute prejudicial error.

## X.

Defendant contends that the prosecutor improperly cross-examined defendant regarding his opinion of the veracity of witnesses for the State. The prosecutor asked defendant whether Officers Duigan and McKeon were lying and whether the other State's witnesses had something against defendant or had a reason to lie. Defendant made no objections at trial to the cross-examination, but he argues on appeal that the cross-examination constituted plain error.

■ We agree with defendant's contention that it is improper to ask a defendant to judge the veracity of a witness against him since it is within the province of the jury, where testimony conflicts, to determine which witnesses are telling the truth. (*People v. Hicks* (1971), 133 Ill. App. 2d 424, 273 N.E.2d 450.) However, it has been held that if no objections are made at trial to the improper cross-examination, the issue is waived. (*People v. Hill* (1978), 58 Ill. App. 3d 822, 374 N.E.2d 1020.) In view of the facts in the case at bar that defendant's testimony was contrary in many respects to that of the State's witnesses and that the evidence against defendant was overwhelming, we find that the improper

cross-examination did not constitute a "grave error" requiring reversal. *Roberts.*

### XI.

Finally, defendant contends that comments made by the prosecutor in closing argument were improper and highly prejudicial to defendant. During the closing argument the prosecutor stated that defendant testified on his own behalf and admitted to being a "dope dealer" so as to avoid a murder conviction and to "cop out to manslaughter." The prosecutor then compared the selling of narcotics to murder, stating:

> "The same hand that dispenses death with these each day, that same hand fired this gun directly at Officer Crowley. The killing attitude is the same, the hand is the same, the coldness is the same. The way Willie Lewis treats human beings, there is no true distinction between these.
>
>     ❂ ❂ ❂
>
> The only difference between this crime and what he did to Officer Crowley on September 13th as opposed to what he does on every other day of his life is that Crowley's death is more obvious."

Most of the comments complained of by defendant, in particular the ones referred to above, were not objected to by defendant at trial.

■■ The general rule is that remarks by counsel alleged to be prejudicial to defendant must be objected to at trial or the issue is waived. (*People v. Madden* (1978), 57 Ill. App. 3d 107, 114, 372 N.E.2d 851.) However, improper remarks during closing argument deny defendant a fair trial and constitute reversible error where the comments influenced the jury to such an extent that substantial prejudice to defendant resulted (*People v. Nilsson* (1970), 44 Ill. 2d 244, 248, 255 N.E.2d 432, *cert. denied* (1970), 398 U.S. 954, 26 L. Ed. 2d 296, 90 S. Ct. 1881), or where they operated as a material factor in the conviction (*People v. Clark* (1972), 52 Ill. 2d 374, 390, 288 N.E.2d 363). The reviewing court must determine whether the verdict would have been otherwise had the objectionable comments not been made. (*People v. Davis* (1970), 46 Ill. 2d 554, 560, 264 N.E.2d 140.) In closing argument it is not improper for the prosecutor to comment unfavorably on the defendant or to place defendant in a bad light, if the State's argument is based on competent and pertinent evidence. (*People v. Carbona* (1975), 27 Ill. App. 3d 988, 1010, 327 N.E.2d 546, *cert. denied* (1976), 424 U.S. 914, 47 L. Ed. 2d 319, 96 S. Ct. 1114.) The prosecutor may draw legitimate inferences from facts in evidence. (*People v. Oliger* (1975), 32 Ill. App. 3d 889, 893, 336 N.E.2d 769.) Further, the prosecutor is permitted to comment upon the evil results of a crime and its effect upon the community. *Madden*, at 114.

The comment by the prosecutor in the case at bar that defendant was a "dope dealer" was based on facts in evidence, namely defendant's own

admissions. Although the further comments regarding defendant's "killer attitude" and how he "dispenses death" would have been better left unsaid, we find that in view of the overwhelming evidence against defendant, the comments did not constitute a material factor in the conviction. Based on the record we cannot conclude that the verdict would have been otherwise had the comments not been made.

Based on the foregoing discussion we affirm the judgment of the circuit court of Cook County.

Affirmed.

DOWNING and HARTMAN, JJ., concur.