THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* SHARON K. CAMACHO *et al.*, Defendants-Appellants.

First District (5th Division)    No. 77-861

Opinion filed April 12, 1979.—Supplemental opinion filed on denial of rehearing May 25, 1979.

Leonard Karlin, of Chicago, for appellants.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and J. Jonathan Regunberg, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:
Defendants, Sharon K. Camacho and Bobby Cross, were charged by indictment with four counts of aggravated battery (Ill. Rev. Stat. 1973, ch. 38, par. 12—4) and one count each of attempt murder (Ill. Rev. Stat. 1973, ch. 38, par. 8—4) and armed robbery (Ill. Rev. Stat. 1973, ch. 38, par. 18— 2). A jury found both defendants guilty on all counts. Defendant Camacho was sentenced to concurrent terms of 4 to 12 years for attempt murder and armed robbery, and defendant Cross received concurrent sentences of 4 to 12 years for armed robbery and 6 to 18 years for attempt murder. The defendants were not sentenced separately for aggravated battery.

On appeal, defendants contend that: (1) they were denied their right to a speedy trial; (2) the trial court committed reversible error in not properly inquiring into an allegation that some of the jurors were prejudiced against defendants; (3) the court did not properly instruct the jury on the elements of attempt murder; (4) the jury was not properly instructed regarding the justifiable use of force; (5) it was error to exclude testimony of the judge who presided at a previous hearing regarding the victim's alleged failure to recognize defendant Cross; (6) it was prejudicial error to allow evidence of Cross' prior use of assumed names; and (7) the multiple convictions are improper because they arise from a single act and the indictment was amended during the trial. We affirm in part and vacate in part.

The charges against defendants arise from the beating and robbery of Jerome Lowe in an apartment building on the north side of Chicago, Illinois. Officer Eddy Spencer of the Chicago Police Department testified that at about 2 a.m. on April 14, 1975, he and his partner, Officer Frank Reeger, were stopped by one James Johnson while they were on regular patrol in the 4000 block of north Sheridan Road. After a conversation with Johnson, the three men drove in the police squad car to a nearby 4-story apartment building at 4119 North Kenmore. Jerome Lowe was standing in the doorway of the building, his head and face covered with blood. Spencer called for a squadrol to take Lowe to the hospital.

Spencer testified that he, Reeger and Johnson then went to the second floor of the building, where they were met by Johnson's wife and a friend of hers. The officers were directed to apartment 201. The door was opened by a woman named Peggy Hammond and behind her was a woman whom Spencer identified as defendant Camacho. Upon entering the apartment, Spencer saw a man, whom he identified as defendant Cross, peek out from the doorway to a back room. Spencer entered the room and found Cross in a corner. About 2½ feet away from Cross were a 3-foot chain with a pipe attached and a 3-foot piece of pipe. Both had wet blood on them.

Both Camacho and Cross were arrested. Spencer testified further that Camacho, who had been drinking, had blood on her dress but complained of no injury. There was blood on a cast which was on Cross' right hand and Cross' shirt was also covered with blood, but Spencer noticed no wounds or injuries when the shirt was removed after Cross was taken into custody.

Spencer did not know the whereabouts of the Johnsons or Peggy Hammond, but stated that six attempts had been made in the last two months to locate them. None of them had appeared to be injured in the incident. On cross-examination Spencer testified that he had also seen

blood in the hallway of the building, about 25 feet from Peggy Hammond's door. He also said that he had seen one other person in the lobby of the building. It was stipulated that Officer Reeger's testimony would be the same as Spencer's. Neither the Johnsons nor Peggy Hammond were called to testify.

Jerome Lowe testified that shortly after midnight on the morning of April 14, 1975, he left his home and walked to Sheridan 'L' Liquors to buy some cigars. He sat down at the bar and a short time later two women came over and sat next to him. He identified defendant Camacho as one of the women and said that Cross, whom he also identified in court, was seated at a table in the bar with a woman. Lowe brought some drinks for Camacho, her friend and himself as the three conversed. Lowe was in the bar for about an hour and a half, during which time he received $150 from the bartender for what he characterized as a bet. The two women were still sitting with him as he put the money in his shirt pocket. An assignation was arranged with the women and Lowe went to the washroom once before leaving the bar. He did not recall seeing Cross in the bar when he came out of the washroom.

Lowe left the bar with the two women and went to an apartment building around the corner on Kenmore. As Lowe entered the apartment, Cross was standing behind the door, telling him to give him his money. Lowe testified that he was hit on the head, first from behind, then from the front, and that he saw the chain and pipe in the hands of both defendants. Cross, who had a short cast on his right hand, hit Lowe with a chain and Lowe fell to the floor. He staggered into the hall, where he fell again, all the while trying to use his hands to protect his face. As he was hit repeatedly, one of the women screamed, "Stop, you're killing the guy." Camacho reached into Lowe's pocket as he lay on the hallway floor and took his money, a watch and a ring. Camacho had a knife, Lowe continued, and said she was going to cut off Lowe's finger to get his ring. Lowe managed to get up and Cross hit him a few more times as they ran down the hallway. Lowe ran downstairs and passed out in the arms of one of the police officers.

Lowe also testified that he was in the hospital for two weeks, spending the first few days in intensive care. He had stitches on his head and casts on both hands. He returned to the hospital for an additional week because of an infection in his scalp wounds and has had three operations on his hands since they were injured.

On cross-examination Lowe testified that Camacho had entered the apartment first and that the area was illuminated by a light coming from the bathroom. Camacho had a pipe in her hand in the hallway and struck the first blow. She dropped the club in the hall and had a knife in

her hand. Lowe also acknowledged that the hospital receipt for his personal property showed that he had one dollar, a wallet, keys and rings with him when he entered the hospital.

Defense counsel was not permitted to impeach Lowe's identification of the defendants with an alleged statement, not in the court record, that Lowe did not recognize Cross at an earlier court appearance, but an offer of proof to that effect was allowed.

Dr. Jeffrey L. Karasick, a neurosurgeon at Weiss Memorial Hospital, next testified that his examination of Lowe on April 14, 1975, disclosed that Lowe had skull lacerations that had been closed with 60 sutures. There was some swelling about his head and eyes and some bruising on his forehead. Lowe's hands were swollen and immobilized and X-rays showed no skull fracture, but both hands were broken. Dr. Karasick said that the injuries were caused by a hard, blunt object, and could have been frgm a chain or pipe. Lowe was admitted to the hospital on April 14, 1975, spent four days in intensive care and was discharged on April 24, at which time he had casts on both hands. He was readmitted on May 7 with infections in the head wounds and was discharged a week later. Dr. Karasick testified that there was permanent damage to Lowe's thumb which could be attributed to the nature of the fracture suffered, but that aging, infection or certain disease could have had the same effect.

The pipe and the pipe and chain were admitted into evidence, as were pictures of Lowe's head injuries, and the State then rested its case.

Sharon Kay Camacho testified on behalf of the defense that on the night in question she lived in apartment 311 at 4119 North Kenmore. She and a friend, Peggy Hammond, had gone to Sheridan 'L' Liquors around 11:30 p.m. and sat next to each other at the back of the bar while they had a drink. Lowe came over and sat next to Peggy Hammond, struck up a conversation with her and bought her some drinks. Camacho, who said she was drinking wine, testified that she was buying her own drinks and that Lowe never offered to buy her one. She also stated that she knew no one else at the bar that night.

Camacho further stated that after about an hour, Lowe having offered Peggy Hammond $20, Peggy Hammond asked Camacho if she could borrow her apartment keys because she needed some money and wanted to take Lowe up there. Camacho refused to give up her keys but offered to go with the other two and let them in. Lowe then borrowed a $50 bill from the bartender John. Camacho, Lowe and Peggy Hammond left the bar around 1:30 a.m. and went around the corner to Camacho's apartment. Camacho let Lowe and Peggy Hammond in, told them she would return in 20 to 25 minutes, and closed and locked the door behind her. She then went downstairs to Peggy Hammond's apartment where her children were with a baby sitter.

When she returned to her own apartment and opened the door, Peggy Hammond ran out. Camacho went inside and Lowe, who was putting on his pants as he came out of the bedroom, said his money was gone and accused the two women of setting him up for the theft. Lowe swung at Camacho, who dodged and fell back against the television set. Noticing her dog chain on the television, she grabbed it, hit Lowe and ran out the door and down the back stairs toward the second floor hallway. Lowe followed, trying to hit her, and she kept hitting him with the chain. Hearing Cross in the building, Camacho called for help. Cross grabbed a pipe that was holding the door to the hallway open, hit Lowe once, and Lowe fled. The two defendants had gone to Peggy Hammond's apartment to find out what had happened between her and Lowe when the police arrived.

Camacho demonstrated that she had the chain wrapped around her left wrist as she hit Lowe, who was within arm's length. She stated that Lowe did not hit her, but she kept hitting him as he kept trying to come closer. She further testified that Lowe was running behind her, trying to hit her with his fist, that he blocked her way out of the building, and that he stopped his pursuit after Cross had struck him with the pipe. She also said that the Johnsons had witnessed what occurred on the second floor.

On cross-examination Camacho stated that she had merely closed her apartment door when she had left, as it was not necessary to lock it with the key. Lowe had grazed the side of her head when he first swung at her, she added, although she had no bruises or swelling. Approximately six or seven minutes passed between the time she first hit Lowe and Cross' arrival.

Bobby Cross next testified that on the evening of April 13, 1975, he was at the Beritz Lounge on the corner of Sheridan and Irving Park Roads from 9 p.m. until 1:30 a.m. At that time he left the tavern and went to the apartment building at 4119 North Kenmore to visit a friend on the second floor. He was singing as he entered the building, when he heard a scream and someone calling for him to help. He went toward the sound of the voice and saw Camacho and Lowe struggling with each other on the back stairs cubicle. Camacho's back was against the wall, Cross said, and Lowe had his head against her chest and his hands around her throat. Cross asked what was going on and Lowe turned and hit him on the jaw, knocking him down and backwards into the back stairs. Cross saw a pipe propping the door open and picked it up. He hit Lowe once with it and Lowe fled. The defendants did not follow but went instead to Peggy Hammond's apartment. Peggy Hammond answered the door when the police arrived. Cross was in the bathroom at the time and was at the doorway coming out of the bedroom when he was seized by the police.

On cross-examination Cross testified that Lowe was not bleeding

when he saw him. He also stated that Camacho was not swinging the chain and he did not see her hit Lowe. Testimony regarding Cross' use of other names was admitted for impeachment purposes over defense objections.

The final defense witness, called over the State's objection, was John Lagios, the bartender on duty at Sheridan 'L' Liquors on the night in question. He testified that Peggy Hammond and defendant Camacho were sitting at the back of the bar when Lowe came over, put his arms around both of the women and then talked to Peggy Hammond. The women were drinking cokes, Lagios said, and Cross was not in the bar at all. Lagios lent Lowe $50, but there was no bet payment involved. He served no more drinks to Lowe who then left the bar with the two women.

The hospital inventory of Lowe's property was admitted into evidence, as was a hearing transcript of May 25, 1976, although the latter was not submitted to the jury. The jury returned a verdict of guilty on all counts against both defendants and defendants appealed.

OPINION

I.

Defendants first contend that they were denied their right to a speedy trial when the State did not bring their case to trial within 160 days of defendants' demand, as required by section 103—5(b) of the Code of Criminal Procedure of 1963. (Ill. Rev. Stat. 1975, ch. 38, par. 103—5(b).) However, the trial court may continue a case for an additional 60 days if it determines "that the State has exercised without success due diligence to obtain evidence material to the case and that there are reasonable grounds to believe that such evidence may be obtained at a later day." Ill. Rev. Stat. 1975, ch. 38, par. 103—5(c).

Defendants demanded trial on October 26, 1976. On February 22, 1977, the State filed a petition to postpone the trial in order to provide them with more time in locating James and Sheryl Johnson, Peggy Hammond and Casino Vinenes. A hearing on the motion was held, at which two investigators and two assistant state's attorneys testified about their efforts to locate the witnesses since September 20, 1976. They further testified that, in the last few days before the hearing, they had developed new leads as to the whereabouts of the witnesses and believed that further efforts to locate the witnesses would be successful. The trial court then continued the case to March 22, 1977.

Defendants rely on *People v. Shannon* (1975), 34 Ill. App. 3d 185, 340 N.E.2d 129, in support of their contention that the State was not diligent in attempting to find the witnesses. In *Shannon*, the State made its first attempts to locate two police witnesses four days before the trial date.

The search for a third witness had begun six days before the trial date, although the defendant, who had been in custody, had answered ready for trial about a month before. Unlike the *Shannon* case, the record before us reflects attempts on the part of the State that extend over a period of several months and which preceded defendants' first demand for trial.

■ Defendants' contention that the witnesses were not material because they did not testify at trial is equally unfounded. The trial court's decision must be considered in light of the situation as it was presented at the time of the decision, rather than in retrospect. (*People v. Poland* (1961), 22 Ill. 2d 175, 174 N.E.2d 804; *People v. Robinson* (1976), 41 Ill. App. 3d 433, 354 N.E.2d 551.) The court was aware at that time that James and Sheryl Johnson were eyewitnesses to the beating. Peggy Hammond was either involved in the beating or precipitated it, and Casino Vinenes saw the victim immediately after the beating. Clearly, the witnesses could be considered material. Furthermore, at no time during the hearing on the State's request for continuance did defendants question the materiality of the missing witnesses. Moreover, defendants had repeatedly sought additional information about the witnesses in their discovery requests, thus implying their belief that the witnesses were material. (Compare *People v. Antrim* (1979), 67 Ill. App. 3d 1, 385 N.E.2d 5.) The ultimate inability of the State to produce the witnesses cannot negate the fact of their materiality and does not necessitate such a conclusion.

■ The decision to grant a continuance under section 103—5(c) is within the discretion of the trial court and will not be reversed unless there is a clear abuse of that discretion. (*People v. Arndt* (1972), 50 Ill. 2d 390, 280 N.E.2d 230; *People v. Franklin* (1976), 42 Ill. App. 3d 408, 355 N.E.2d 634; *People v. Gamble* (1976), 41 Ill. App. 3d 394, 353 N.E.2d 136.) The record discloses no abuse of discretion in allowing the continuance. Nor can we say that there was error in granting the continuance because there was no affidavit filed in support of the State's petition, for, contrary to defendants' contention, there is no requirement that the request to postpone the trial be so verified. (*People v. Gamble*; *People v. Bey* (1973), 12 Ill. App. 3d 256, 298 N.E.2d 184.) We therefore conclude that the trial court did not err in allowing the continuance and defendants were not deprived of their right to a speedy trial.

## II.

Defendants next contend that they were denied their right to a trial by jury in that the court did not properly inquire into an allegation that one or more of the jurors had prejudged the case.

Defendant Camacho testified in Chambers that she had overheard a statement made by one of the jurors that she thought both defendants

were guilty. Camacho heard nothing else and the topic of the conversation then changed. The incident occurred after the State had rested its case in chief and before the defendants had initiated their defense. After hearing Camacho's testimony, the court denied defendant's motion to withdraw a juror.

When the court reconvened in the presence of the jury, the jurors were asked, as a whole, whether any of them had had any discussion regarding the final outcome of the case. The record indicates there was no response. The court then asked: "Are each and every one of you, including the alternates, still sitting there with open minds prepared to give a fair and impartial trial to these Defendants?" A number of the jurors then "nodded their heads or answered 'yes.' " After a further request by defense counsel, the following appears on the record:

"THE COURT: Mr. Karlin, I've instructed the Jury and the Court is satisfied that they have all answered under oath. They are under oath.

MR. SMITH: I'd like to indicate for the record that the Jury, as a body, did give a negative response to your Honor's question."

In addition to the above colloquy, the court also admonished the jury not to discuss the case among themselves.

The case of *People v. Cole* (1973), 54 Ill. 2d 401, 298 N.E.2d 705, discussed at length the problem of challenges to the impartiality of a juror. The court stated:

"The determination of whether or not the prospective juror possesses the state of mind which will enable him to give an accused a fair and impartial trial rests in the sound discretion of the trial judge. His determination should not be set aside unless it is against the manifest weight of the evidence. [Citations.]

The determination of impartiality is not purely an objective determination * * *." 54 Ill. 2d 401, 414, 298 N.E.2d 705, 712.

The incident in question here occurred at a time in the trial when only the State's case in chief had been heard. The trial judge heard defendant Camacho's testimony and then examined the jury, en masse, under oath. Moreover, the trial court repeatedly admonished the jury not to discuss the case and to decide the case on all of the evidence. The instant case is unlike those relied upon by defendants, which involved statements, made by jurors before they had heard any evidence, that they would "hang that —[defendant]" (*People v. Ortiz* (1926), 320 Ill. 205, 150 N.E. 708), or that he knew of defendant's activities and "it was coming to him sooner or later." *People v. Cravens* (1941), 375 Ill. 495, 31 N.E.2d 938.

■ Although there was some suspicion of bias as a result of the conversation, we note that the supreme court said in *Cole*:

"The opinion of the appellate court indicates that a juror must be

free from even the suspicion of bias or partiality. [Citation.] We wish to dispel this misconception. The determination of the qualification of the juror is a judicial determination. This determination by the court, like the determination of any other issue of fact, must be made from the evidence. [Citations.]" (54 Ill. 2d 401, 415; 298 N.E.2d 705, 713.)

In light of the foregoing principles, we find there was no abuse of discretion on the part of the trial court in making its determination that the jury was not prejudiced, and we further conclude that the trial court's decision is not against the manifest weight of the evidence.

### III.

Defendants next contend that their attempted murder convictions should be reversed because the instructions submitted to the jury permitted it to find defendants guilty of attempted murder even if the evidence established only that defendants intended to cause great bodily harm short of death. Such an instruction was considered by our supreme court and found to be erroneous in *People v. Harris* (1978), 72 Ill. 2d 16, 377 N.E.2d 28. Jury instructions for attempted murder were again considered in *People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331, in which the supreme court held that defendants had waived their right to raise the jury instruction issue on appeal because they had failed to raise the objection at trial.

While acknowledging that the giving of the erroneous instruction over an objection will warrant the reversal of a conviction, the court in *Roberts* also recognized the need to preserve such error for review. In reaching its conclusion, the court noted that the inclusion of the other mental states in the jury instruction did not constitute "grave error," for the evidence was not "closely balanced" and the error did not threaten the "fundamental fairness" of the trial. (75 Ill. 2d 1, 14.) *Roberts* thus adheres to a narrow application of exceptions to the waiver rule which would allow consideration on appeal of issues not preserved at trial.

In the case before us, defendants objected to the giving of the erroneous instruction. However, the issue was not raised in defendants' post-trial motions, and we therefore consider the issue to be waived. Although in *Harris* the jury instruction issue was considered where defendant had objected at trial but did not raise the issue in his post-trial motion, we find the pertinent facts in our case to be more closely related to *Roberts*. As in *Roberts*, the evidence is not "closely balanced." Defendants here admitted involvement in the incident. The extent of the injuries to the victim are not in question, and the only real issue at trial was whether the defendants were justified in using the force they did. We conclude, therefore, that, under the principles expressed in *People v.*

*Roberts,* defendants are precluded from having the attempted murder jury instructions considered on appeal.

## IV.

Defendants further contend that the jury was not properly instructed regarding the justified use of force because the instruction submitted by the State did not contain a reference to the necessity of showing lack of legal justification. We do not agree.

■■ It is not necessary, nor is it possible, for a single instruction to state all of the law of the case or of a given subject. Instead, the instructions must be considered as a whole. (*People v. Porter* (1957), 11 Ill. 2d 285, 143 N.E.2d 250; *People v. Hubbs* (1948), 401 Ill. 613, 83 N.E.2d 289.) Instructions were given regarding the use of justifiable force in the defense of one's self as well as of another. It was not necessary for those instructions, which were submitted by defendants, to be included in the instructions which set forth the State's theory of the case. (*People v. Hubbs.*) "It is sufficient if the series of instructions, construed as a whole, fully and fairly announced the law applicable to the theories of the defendant." (*People v. Turner* (1967), 82 Ill. App. 2d 10, 27, 226 N.E.2d 667, 675.) This the instructions did.

Defendants' reliance on *People v. Jenkins* (1977), 69 Ill. 2d 61, 370 N.E.2d 532, is misplaced. *Jenkins* involved the giving of conflicting instructions, one of which was incorrect. The supreme court held that it is prejudicial error to give the jury contradictory instructions on an essential element, because it forces the jury to decide which instruction is proper, a function which is clearly reserved for the court. There are no conflicting instructions here. Rather, there is a complete set of instructions which sets out both theories of the case and, when read together, contains a complete statement of the applicable law.

■■ We also disagree with defendants' contention that their proposed instruction defining the term "deadly weapon" was improperly refused. The definition of a deadly weapon was set out in *People v. Fort* (1970), 119 Ill. App. 2d 350, 354, 256 N.E.2d 63, 66:

> "A deadly weapon has been defined as 'an instrument that is used or may be used for the purpose of offense or defense and capable of producing death.' [Citation.] An instrument which is not deadly per se may become so by the manner in which it is used."

The instruction tendered by defendants defined a deadly weapon as "such instrument as is made and designed for offensive or defensive purposes, or for the destruction of life or infliction of injury." The proposed instruction was incorrect and thus there was no error in the court's failure to give that instruction to the jury.

## V.

■ We turn next to defendant Cross' contention that it was error to exclude the testimony of the judge who had presided at an earlier proceeding in this case at which Jerome Lowe, the complaining witness, allegedly did not recognize defendant Cross. We hold that no error was committed because the incident pertains to the question of the identity of Lowe's assailant, which was not at issue at trial. Although Cross originally indicated that he would present an alibi defense, his defense theory was changed at trial to one of justifiable use of force. Cross admitted in his testimony that he struck Lowe in the altercation for which Cross was subjected to criminal charges. Defendant Camacho also testified both that Cross was present and that he had hit Lowe. Because Cross admittedly was involved in the incident which was the basis for the charges against him, there could be no error in refusing testimony regarding a matter that was not in issue.

## VI.

■ It is also contended that the introduction of evidence of defendant Cross' prior use of assumed names constitutes reversible error. The State concedes that, under *People v. Berlin* (1978), 58 Ill. App. 3d 612, 374 N.E.2d 948, their questioning of Cross as to his use of other names was error, but also maintains that the error was harmless. We agree. In *Berlin*, defendant's conviction was reversed where the trial court had allowed testimony as to the use of an assumed name and refused to permit defense counsel's attempts at rehabilitating the defendant after impeachment. On appeal, the court stated that the trial court's actions thus "gave the evidence an unwarranted gloss of legitimacy which the jury could not fail to take into consideration." (58 Ill. App. 3d 612, 615-16, 374 N.E.2d 948, 950.) In the instant case, Cross was provided the opportunity on redirect examination to explain the reasons for his use of other names, thus ameliorating the effect of the testimony.

Cross relies upon *People v. Pumphrey* (1977), 51 Ill. App. 3d 94, 366 N.E.2d 433, in which the admission of evidence of the use of other names by defendant and his wife was found to be reversible error where it could not be said that the errors did not contribute to the conviction. In *Pumphrey*, the defendant had been asked if he had used particular names on specific dates and denied doing so. The trial court allowed rebuttal testimony that contradicted defendant's denial. The State had repeatedly posed questions to defendant's wife and her sister regarding the wife's use of aliases, interspersing those questions with questions implying the use of a false address. In dealing with defense objections to the questions, the trial court's rulings were inconsistent. On appeal it was found that the

State did not prove that defendant's wife had used other names and thereby failed to perfect its impeachment of her testimony.

The errors in the instant case do not approach the magnitude of those in *Pumphrey*. The references to the use of other names was limited, and while the State's rebuttal evidence consisted of reading into the record two conviction statements of defendant, they were convictions under the name Cross had admitted using.

Most importantly, unlike the *Pumphrey* case, it can be said here that the improperly admitted testimony had no effect on Cross' conviction. Both Cross and Camacho relied on the defense that their use of force was justified. In convicting Camacho, the jury rejected her claim that she was justified in her actions. It follows, then, that the jury either believed that Camacho's use of force was excessive, or that it was not justified at all. Because Cross claimed that he came to Camacho's aid, once the jury rejected Camacho's claim of justifiable force, it necessarily had to reject Cross' claim that he was justified in using force. Consequently, we find that the admission of evidence regarding Cross' use of other names does not warrant a reversal.

## VII.

■■ ■ Finally, defendants contend that the multiple convictions are improper because they arise from the same incident. The State contends, and we agree, that the separate convictions and sentences for attempted murder and armed robbery are not erroneous because the intent to kill necessary for the attempted murder conviction was the product of a separate and independent motivation from that necessary to complete the armed robbery. (*People v. Glaze* (1977), 48 Ill. App. 3d 523, 362 N.E.2d 1287; *People v. Thomas* (1970), 127 Ill. App. 2d 444, 262 N.E.2d 495.) However, we disagree with the State's contention that there was no error in the convictions for aggravated battery because no separate sentence for the aggravated battery was imposed. The aggravated battery was a lesser included offense of the attempted murder (*People ex rel. Walker v. Pate* (1973), 53 Ill. 2d 485, 292 N.E.2d 387), and, although the judgment on the aggravated battery convictions was not made final because no separate sentence was imposed, the court's entry of judgment on the guilty verdicts may nevertheless operate to defendants' prejudice. (*People v. Lilly* (1974), 56 Ill. 2d 493, 309 N.E.2d 1.) We therefore vacate the four aggravated battery convictions entered against each defendant.

We find no merit to defendants' contention that the armed robbery indictments were improperly amended at trial by deleting the word "ring," that word being an unnecessary allegation in the indictment, which would be removed at any time on motion by the State. Ill. Rev. Stat. 1975, ch. 38, par. 111—5(d).

## VIII.

For all of the foregoing reasons, the judgment of the circuit court of Cook County is affirmed in part and vacated in part.

Affirmed in part; vacated in part.

SULLIVAN, P. J., and LORENZ, J., concur.

## SUPPLEMENTAL OPINION ON DENIAL OF REHEARING

Mr. JUSTICE MEJDA delivered the opinion of the court:

Defendants have filed a petition seeking a rehearing, but we find that they have not presented any points which have not already been considered in our original decision. However, in an effort to argue that we have misapplied the law to the record in reaching our decision, defense counsel has made several statements in the petition which totally misrepresent the facts and which thus require our comment.

The petition first states that we have indicated that this is an "open and shut case." At no time have we so characterized the case, but have instead stated that "as in *Roberts* the evidence is not 'closely balanced.'"

The petition further alleges:

"This court recounted the evidence presented by the State, and that of the defense (incidentally adding details of a derrogatory [sic] nature that appeared in neither the State's account, nor in the record, e.g. p. 2. 'About 2½ feet away from Cross were a 3 foot chain with a pipe attached and a 3 foot piece of pipe. Both had wet blood on them.' The record will show the dog chain was attached to a handle and the items were given the police by Peggy Hammond, and had no wet blood on them; also Camacho 'had been drinking' and 'Cross' shirt was covered with blood.' These comments were neither correct nor supported by the record."

The claim that we have added derogatory details from beyond the record is spurious. The statements quoted above were attributed to the testimony of Officer Eddy Spencer, and the transcript of that testimony at pages 57 through 63 speaks for itself.

The other factual conclusions which are contained in the petition, as well as the claim that defendants' testimony was uncontradicted, are equally lacking in substantiation.

The vigorous representation of a client can often tempt his attorney to hyperbole in order to make an argument more emphatic. We find, however, that the liberties which defense counsel has taken with the record are excessive. Defense counsel has either ignored or misrepresented the facts in this case and has spread unsupported

958

assignments of error across the public record in an overzealous effort to procure a rehearing. Such tactics serve neither defendants nor the interests of justice and cannot be condoned.

The petition for rehearing is denied.

SULLIVAN, P. J., and LORENZ, J., concur.