THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
STEVEN McCLURE *et al.*, Defendants-Appellants.

First District (2nd Division)    No. 79-362

Opinion filed December 31, 1979.

James J. Doherty, Public Defender, of Chicago (James H. Reddy, Assistant Public Defender, of counsel), for appellants.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Mary Ellen Dienes, and Armand L. Andry, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE HARTMAN delivered the opinion of the court:

Following a jury trial on July 29, 1977, defendants Steven McClure and Bernard Singleton were found guilty on two counts of attempt murder as to Chicago police officers Willie Ware and A. Gene Beach and guilty of aggravated battery as to Officer Ware. McClure received concurrent sentences of from 12 to 30 years and Singleton was sentenced to from 10 to 25 years to be served concurrently. From these convictions and judgments, defendants appeal. The issues presented for review are whether: (1) Officer Ware's identification of defendants as his assailants was sufficient to prove their guilt beyond a reasonable doubt; (2) the trial court committed reversible error by instructing the jury as to the definition of murder without deleting the discredited "great bodily harm" language; and (3) the prosecutor and court combined to commit reversible error where the prosecutor attempted to prove motive during the course of the trial, offered the motive instruction, argued motive evidence to the jury, and the trial court improperly gave the instruction. For the reasons which will later appear, we affirm..

The evidence relevant to the issues on appeal reveals that Officers Wade and Beach were on uniformed patrol at about 8 p.m. on January 18, 1975, when they received a radio assignment as "back up" to respond to a call of "shots fired" in apartment 1608 of a project building at 111 W. Roosevelt Road, Chicago. They arrived before any other police units and decided to proceed with the investigation. The officers observed that the even-floor elevator was not working or was slow in coming and took the odd-floor elevator to the 15th floor instead and from there walked up to the 16th floor.

Officer Ware testified that he saw two men standing in the 16th floor hallway, facing and staring intently at the 16th floor elevator door. Ware asked them, "what's happening?" Both men, defendants McClure and Singleton, appeared startled, took their hands out of their pockets quickly and turned to face him. Ware recognized both of them. He had had previous contact with McClure for almost one-half to three-quarters of an hour one month before this occasion and another contact just one week before. He had seen Singleton frequently over a span of four or five years. At this confrontation, Singleton answered Ware by telling him that "some crazy fools were shooting at them from apartment 1608." Ware told them to wait there and he and his partner walked from defendants toward apartment 1608. When they reached a point approximately 20 to 25 feet

from where defendants had been standing, a series of shots suddenly rang out and Ware was struck by one of the bullets, the impact of which spun him around so that he was then facing the stairwell from which he had come. He saw the two defendants firing at him as they were in the center of the ramp and backing up toward the doorway. He saw one flash come from Singleton's gun and two from McClure's. He tried to get his own revolver out but was able to do so only after defendants disappeared. Ware radioed the dispatcher, reported the shooting and requested assistance. He was then removed to the Illinois Research Hospital. The next day, while in the intensive care unit, he identified defendants from a series of photographs.

Officer Beach testified similarly as to the facts leading up to the shooting. When the shots were fired, he went toward the wall and, as he did so, saw his partner on the ground trying to get his gun out. Ware told him he was hit as the gunfire continued. Beach sat alongside Ware and observed two flashes come from the doorway when he pulled his own revolver out. He later observed that apartment 1608 was vacant and completely boarded up. Beach was unable to identify the gun-firing assailants, but, on the following day, January 19, he attended two police lineups at Maxwell Street police headquarters, conducted by Sergeant Frank Bertucci on each occasion, and identified defendants McClure and Singleton as the men that he and Ware had encountered on the 16th floor in the project the previous evening just before the shooting.

Chicago Police Officer Ben Carfo testified that on January 18, 1975, he was assigned to the 12th District Police Station at 100 S. Racine and was in uniform. At the station he observed a former partner of his, Officer May, arrest a female, later identified as Bertha Newell, who was handcuffed and was entering in the company of three black males and another black female. Newell earlier had testified that they had been involved in an auto accident with police. Two of the men in that party were Singleton and McClure who stood in the hall looking into the review room. As he stood about one foot away, Carfo heard Singleton say to McClure, "Cool it man. Cool it. Our turn is coming. We'll get even." He then went on about his patrol duties outside the station.

McClure testified in his own defense that on the day of the shooting he lived in the project building involved and shortly after 8 p.m. was at his girlfriend's apartment on the 13th floor. He left there to see a friend, Cleveland Kane, who had come home from the Army and met Singleton in the stairwell. They stopped on the 14th floor for Singleton's coat and then went to Kane's apartment, 1610. Between the 14th and 15th floors they met some friends playing dice and stopped for six to eight minutes and then took the stairwell to the 16th floor. No one responded to their

knock at apartment 1610. As they waited one or two minutes, two policemen came up the stairs and asked "what's happening?" McClure told them that "some crazy fool was shooting down there and I didn't know." The police proceeded down the passageway and defendants left. As they turned to enter the stairwell they saw some men, one of whom stepped up and shot. McClure stepped to the side and ducked. The person doing the shooting was one Harvey King who fired seven or eight shots. After the shooting stopped the assailant ran down the steps and McClure ran immediately behind him telling the men that they were crazy to shoot at the police.

On cross-examination, McClure stated that he was downstairs when he heard the shots, on the 13th floor at his girlfriend's apartment, although still later he testified that he followed the man who had done the shooting down the stairs after he had fired at the police. He admitted having told police investigators the next day that he had never caught sight of the shooters because he was trying to "put security on my family." He also admitted giving a written statement to police that while he was going downstairs from the 16th floor, after someone coming up the hallway said "run," he heard some shooting and later was told that a policeman had been shot on the 16th floor. He acknowledged having told the police in the written statement that he was on the 14th floor when he heard the shots. During further cross-examination he denied having been on the 14th floor when he first heard the shots. He admitted never before having mentioned to the police, or the assistant state's attorney who took the statement, or his parents, the name of the alleged assailant, Harvey King. He admitted that he had been previously convicted of the offense of aggravated battery.

Singleton also testified in his own defense. On January 18, 1975, at 7:30 p.m., he was in the project building, apartment number 1202, from which he left to go to the store. When out in front of his door, he looked over the fence and saw McClure who told him that a friend was back from the Navy on leave, a man named Cleveland. He and McClure proceeded upstairs to the 16th floor in the hallway to apartment 1610. On the way up he had seen Harvey King and others on the 14th floor stairwell, playing dice. They stayed there for six minutes and then proceeded upstairs where McClure knocked on the door to 1610 as he stood by the balcony. As they waited to receive an answer for about two minutes, Officers Ware and Beach approached them through the same hallway that they had entered and asked them what was happening. They were startled, surprised by the presence of the police. Their hands were not in their pockets at that time. McClure told the police that "some crazy fools had been shooting" earlier, and the officers walked down the porch. As he

and McClure were getting ready to go down the stairwell, he saw two flashes, heard a loud noise and ducked into a corner. Singleton received a powder burn from one of the guns on the left side of his jaw. He grabbed his face and was trying to cover up because he thought he had already been shot. The shots were coming from a point on the landing between the 15th and 16th floors. One of the faces of three men who were in the stairwell or hallway area was that of Harvey King. The shots subsided four or five seconds later and he ran down to the 15th floor and then to the next floor and into another hallway. He then went on to the store without notifying anyone of the shootings. He denied that either he or McClure had possessed a gun, denied shooting anyone that evening or at any other time, and asserted that he had never before been arrested.

On cross-examination, Singleton testified that it was dark at the time of the shooting. One of the shots fired by the assailant was toward him and he was under the impression that he was the target. He did not call the police after the shooting because he was scared and did not want to put his family in jeopardy. Upon being shown a written statement signed by him, Singleton acknowledged his signature and initials at changes made on the statement but could not recall the substance of the statement. He claimed to have mentioned the name of Harvey King to one of the investigators during the course of the statement. The lighting in the area of the hallway and stairwell was dim.

James McClure, Steven's father, testified that on January 18, 1975, after 8 p.m., Harvey King and others asked him to keep three handguns for them, which he refused. He did not report this incident to the police until three days after his son was arrested.

I.

Defendants' first point is that Officer Ware's identification of defendants as his assailants was not sufficient to prove beyond a reasonable doubt that defendants had done the shooting because he had seen them for only two or three seconds, under uncertain lighting conditions, 25 feet away, as he was spinning around and falling as a result of being hit by a bullet in the rear upper thigh. Defendants submit that under these circumstances Officer Ware could not have seen what he believed he saw: the faces of the shooting assailants. Rather, they postulate, he saw what he expected to see: defendants, because it was defendants whom he had encountered at the stairwell moments before the volley of shots rang out. They argue that this identification does not provide a sufficient basis to support Ware's claim that defendants were his assailants, citing *People v. McGee* (1961), 21 Ill. 2d 440, 173 N.E.2d 434; *People v. Jefferson* (1962), 24 Ill. 2d 398, 182 N.E.2d 1; and *People v.*

*Laurenson* (1971), 131 Ill. App. 2d 2, 268 N.E.2d 183. Therefore, they conclude, the convictions based entirely upon Officer Ware's identification testimony must be reversed.

The foregoing cases are factually inapposite, however, to the identification issue presented in this appeal. In *McGee*, the supreme court found reasonable doubt of that defendant's guilt because of overwhelming and uncontradicted alibi evidence introduced on his behalf, in contrast with unsatisfactory identification evidence by the victims of a man they had never before seen, whose features were undiscernible, and whose identification in a lineup was questionable. In *Jefferson*, the supreme court reversed the judgment of conviction because the victim was unable to identify the defendant, who was also previously unknown to him, the alleged witness identified him in a suggestive lineup, another person confessed to the commission of the crime and exonerated the defendant, and the defendant's alibi testimony was uncontradicted. In *Laurenson*, a conviction was reversed because the identification testimony· of the sole witness, who had never been previously asked to describe the alleged perpetrator, was brought to court almost one month after the crime was committed where the defendant was suggestively singled out in her presence by courtroom procedures and questionable police identification practices which were followed, compared to the defendant's corroborated and uncontradicted alibi testimony placing him elsewhere at the time the crime was committed.

The State maintains that based upon circumstantial evidence in addition to Officer Ware's prior familiarity with defendants, his ability to observe them, and Ware's positive identification testimony, there was sufficient evidence to submit to the jury the issue of whether defendants were his assailants and the jury's determination should not be disturbed. In *People v. Horobecki* (1977), 48 Ill. App. 3d 598, 601-02, 363 N.E.2d 1, on which the State relies, the appellate court observed that the testimony of a single eyewitness, when positive and credible, is sufficient to support a conviction although contradicted by the defendant, citing *People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631, and further noted that such testimony is strengthened to the extent of any prior acquaintance of the defendant, citing *People v. Lumpkin* (1975), 28 Ill. App. 3d 710, 329 N.E.2d 262. The foregoing principles are applicable to the present case. Here, the evidence adduced by the State revealed, and the jury had the right to believe, that the police had come upon defendants on the 16th floor as the latter were facing the elevator. Defendants told them that they were being shot at from apartment 1608, a vacant apartment. The police advanced upon the apartment and when they were some 20 to 25 feet

away shots rang out, Ware was hit and spun around so that he was facing the stairwell. Ware then saw McClure and Singleton firing at him from the ramp, backing towards the doorway, under good lighting conditions. Ware knew them both; he had spoken to McClure twice in the preceding month and had seen Singleton frequently during the previous four or five years. Under these facts, ability to observe and make the identification was sufficient.

In a case similar to this, *People v. Watkins* (1976), 44 Ill. App. 3d 73, 357 N.E.2d 1376, the identification of that defendant by a single witness was also challenged because of an asserted limited opportunity of the witness to view the assailant and inconsistencies in her testimony. The appellate court upheld the conviction, citing *People v. Robinson* (1969), 42 Ill. 2d 371, 375-76, 247 N.E.2d 898, *cert. denied* (1969), 396 U.S. 946, 24 L. Ed. 2d 248, 90 S. Ct. 385, for the proposition that prior acquaintance strengthens the reliability of identification testimony. Also, in *Watkins*, the witness' companion could not identify the assailant, as with Officer Beach in the instant case. The *Watkins* court noted, and we concur, that identification need not be made under perfect conditions or for a long period of time in order to support the jury's verdict of guilt beyond a reasonable doubt. In the instant case, the identification testimony presented a typical question of credibility for the jury; we cannot say that the evidence was so unreasonable, improbable or unsatisfactory as to warrant the intrusion by this court into the jury's finding of defendants' guilt beyond a reasonable doubt. *People v. Watkins.*

●■ ■ Defendants next argue that the trial court committed reversible error in having given the jury the murder definition instruction (Illinois Pattern Jury Instructions, Criminal, No. 7.01 (1968) (hereinafter IPI Criminal)) without deleting the "great bodily harm" language condemned in *People v. Harris* (1978), 72 Ill. 2d 16, 377 N.E.2d 28. The State concedes error in the inclusion of the phrase but maintains that because the defense failed to object to the instruction on this basis, and merely raised a general objection to the instruction as a whole, the issue was not preserved for review, citing *People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331. The State further claims that failure of the defense to raise this issue in their post-trial motions constitutes further waiver of this point on appeal, relying on *People v. Camacho* (1979), 71 Ill. App. 3d 943, 389 N.E.2d 1213. The defense counters with *People v. Lewis* (1979), 75 Ill. App. 3d 259, 393 N.E.2d 1098, and *People v. Haar* (1979), 75 Ill. App. 3d 770, 394 N.E.2d 763. Defendants cite *Lewis* for the proposition that plain error would be found even absent preservation of the point on appeal in a case where the evidence was closely balanced. Defendants cite *Haar* in support of the contention that as long as an objection to the erroneous instruction is made at trial, there is no need to cite its having been given in

their post-trial motions for the purpose of preserving the point on appeal. With respect to defendants' theory as to *Lewis*, we fail to see how it can be fairly inferred from the record at bar that the evidence was closely balanced, thus triggering the plain-error exception to the waiver rule. Under the facts of this case explicated at length earlier in the opinion, the evidence well supports the State's theories of attempt murder and aggravated battery. At the same time, the jury could have regarded defendants' evidence as substantially less than convincing, McClure having vacillated in his testimony from establishing their presence on the 16th floor at the time of the shooting and recognizing the alleged assailant, to having been one or two floors below at the crucial time not knowing who did the shooting, and then placing themselves back again on the 16th floor when the shots were fired. Further, the seven to eight shots heard by McClure or eight to 12 heard and seen by Officer Ware amply support the requisite intent to commit the crimes charged. With regard to the application of *Haar*, it appears that the defendant there had raised an objection to the language at the conference on instructions, but merely omitted to set forth as a point of error the giving of the instruction in its post-trial motion. In the instant case, no objection to the forbidden language was made by defendants, nor was the defect brought to the trial court's attention in defendants' post-trial motion. Accordingly, we find that defendants have waived this point.

● 5 As their last point, defendants contend that by offering the motive instruction (IPI Criminal No. 3.04) after having adduced motive evidence through Officer Carfo's testimony relating to Singleton's statement to McClure at the police station following an auto accident that, "our turn is coming. We'll get even," reversible error was engendered and thereafter compounded by the prosecutor in arguing motive to the jury, citing *People v. Manzella* (1973), 56 Ill. 2d 187, 306 N.E.2d 16, *cert. denied* (1974), 417 U.S. 933, 41 L. Ed. 2d 236, 94 S. Ct. 2644. The State correctly contends that *Manzella*, while declaring such a procedure to be error, cautions that it is not reversible error in every case; the error must be such as to deny to defendant real justice or as to influence the jury's verdict. Defendants insist that because of the "single finger" pointing to their identification as the assailants in this case, Officer Ware's testimony, the *Manzella* error committed here cannot be deemed harmless beyond a reasonable doubt. There is no need to repeat the analysis of the evidence appearing earlier in this opinion, from which we conclude that the effect upon the jury of both direct and circumstantial evidence of defendants' guilt far outweighs any possibility that the earlier statement of Singleton was a determining factor in the jury's finding of defendants' guilt. Although error, the giving of the motive instruction and argument of the motive theory by the prosecutor in the face of motive evidence having

18

been produced by the State was harmless beyond a reasonable doubt and cannot be said to have denied to defendants real justice or to have influenced the jury in its finding of their guilt.

For the foregoing reasons the jury verdicts cannot be disturbed, and the convictions and judgments must be affirmed.

Affirmed.

DOWNING and PERLIN, JJ., concur.