THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CHARLES HOUSTON, Defendant-Appellant.

First District (1st Division)    No. 78-1428

Opinion filed February 4, 1980.—Rehearing denied March 10, 1980.

Ralph Ruebner and Michael Mulder, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Iris E. Sholder, and James L. Alexander, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE CAMPBELL delivered the opinion of the court:

The defendant, Charles Houston, was charged by information with two counts of murder of Patrick J. Rainwater. Following a jury trial, defendant was found guilty of murder and sentenced to serve 30 to 60 years in prison. On appeal, the defendant argues that (1) repeated references to the defendant as the "brick man" violated his due process right to a fair trial by leading the jury to believe he had committed prior bad acts involving the use of bricks and had a bad reputation and character; and (2) the State failed to prove beyond a reasonable doubt that the defendant committed the offense with which he was charged.

A pre-trial motion was filed by defendant to prohibit the State from referring to or soliciting evidence concerning the name "brick man." Defendant claimed that the use of this name would be highly prejudicial. The State responded that some of their witnesses knew defendant only by this name and that the name "brick man" was probative of the

identification of defendant. The court denied the motion and ruled that the State could use "brick man" only for purposes of identifying defendant.

Some of the evidence presented at trial may be summarized as follows. A police officer for the City of Chicago, Daniel Darcy, testified that on the morning of August 8, 1976, he and his partner, William Frost, received an assignment to go to 844 West Adams Street in Chicago. Upon arriving, Officer Darcy saw the body of Patrick Rainwater near a loading dock. Officer Darcy observed portions of bricks adjacent to the body. Later, as part of his investigation, he interviewed Sampson Crawford, Herbert Fitzgerald and Willie William at the 12th Police District Station. He then accompanied Sampson Crawford back to 844 West Adams.

Over objection of defendant, Officer Darcy was allowed to testify that he learned from police personnel at 844 West Adams that an individual by the name of "brick man" was in custody at the 12th District. Officer Darcy made arrangements for "brick man" to be transported to Area 4 Homicide Headquarters for a lineup which was viewed by Crawford and Fitzgerald. Officer Darcy was also allowed to testify that when he first saw the defendant he knew him by the name of "brick man." Officer Darcy made an in-court identification of the defendant as the person he had known as "brick man" or Charles Houston.

Rufus Brown, a police officer for the City of Chicago, testified that on August 8, 1976, pursuant to an assignment, he proceeded to 844 West Adams Street and took three photographs of the scene and recovered two pieces of brick near where Rainwater's head had been. Officer Brown made an in-court identification of People's Exhibit 19 and 20 as the two pieces of brick recovered from 844 West Adams and identified People's Exhibit No. 21 as being a glass vial containing the sample taken from the red stain near Rainwater's head.

Willie William testified that at approximately 10:30 p.m. on August 7, 1976, he and Herbert Fitzgerald were in front of a school building on Green Street and that he saw a man sleeping on a loading dock in that area. He could tell that Rainwater was asleep because a light was shining overhead. He and Fitzgerald were at Green and Adams Street to have a drink from a bottle that William had. They were joined by Sampson Crawford and defendant, who was known only to William as the "brick man." Defendant had a brick in each of his hands. Crawford asked William and Fitzgerald if they had any whiskey. Because he saw that "brick man" had two bricks and because he was afraid he handed over the bottle, and he and Fitzgerald then left the scene.

Sampson Crawford testified that Thomas Gato then joined him and the defendant and the trio walked over to a bar at 816 West Madison Street and remained for about 20 minutes. They then walked back to

Green Street and while Gato was taking a drink, defendant removed a brick from his pocket and hit him on top of the head. Defendant then struck Crawford in the forehead. Wounded, Crawford walked across Green Street to wash the blood off his face at a water faucet. Crawford returned to find Gato and as he approached the nearby loading dock, he observed defendant, the "brick man" throw a brick in the face of Patrick Rainwater. After watching defendant cast his bricks into Rainwater's face four or five times, Crawford walked back up the street to look for Gato. Crawford was standing about 30 feet away from the dock when he saw defendant striking and throwing bricks into Rainwater's face.

Bernadette Kwak, a microanalyst from the Chicago Police Department, testified regarding her analysis of the evidence which Rufus Brown had gathered. According to her tests, the stain surrounding Rainwater's head consisted of human, type A blood and that Rainwater had type A blood. She stated that only 40% of the population has type A blood. She found several human hairs attached to the bricks similar to hair from the victim's body. The bricks revealed the presence of several minute "reddish-brown stains of human type A blood." She also tested a sample of defendant's blood taken while in custody and defendant has type O blood.

Next Kwak testified regarding her examination of defendant's clothing taken from him at the time of his arrest. Her tests revealed that certain brownish red stains on the right sleeve cuff, the right front panel, and the rear of the right sleeve consisted of human type A blood. Moreover, certain reddish-brown stains scattered over the front leg panels and inside pockets of defendant's pants consisted of both human type A and O blood. While human type O blood constituted the reddish-brown stains found in the toe of defendant's boots, the stains on the outer side of the right boot consisted of human type A blood. Lastly, Kwak testified that the test conducted on the victim's clothing indicated the presence of human type A blood.

Dr. Yukseg Konacki, a forensic pathologist, associated with the Cook County medical examiner's office, testified regarding the cause of Rainwater's death. According to the witness, the victim had sustained extensive abrasions on the right side of the head and multiple lacerations on his forehead, cheek, and the right side of his chin. Further, the right side of the victim's face was swollen and the right temporal bone fractured. According to the witness, the cause of death was extreme cranial cerebral injury and the weapon was a hard object with a blunt surface.

Defendant called Daniel Darcy, a Chicago police officer, who had testified earlier for the State as his first witness. Darcy stated that on August 8, 1976, he had interviewed Willie William between 9:30 and 10 a.m.

and that William had remarked that he had been drinking vodka at the corner of Madison and Halsted around 1:30 a.m. on the 8th. Darcy's police report revealed that Crawford and Gato had been present with William and that Crawford had attempted to instigate a fight between the other two. Further, the report indicated William had stated that Crawford took a bottle of vodka from him. Crawford never told him that the distance between the loading dock and where he was standing during the murder was 15 feet. In his report Darcy explained he had estimated the distance to be 15 or 20 feet. The defendant did not testify in the subsequent proceedings and the jury found defendant guilty of murder and defendant's motion for a new trial and arrest of judgment was denied. Defendant was sentenced to 30 to 60 years in prison and defendant appeals from said judgment.

The defendant first asserts that "repeated references to him as the 'brick man' violated his due process right to a fair trial by leading the jury to believe he had committed prior bad acts involving the use of bricks and had a bad reputation and character." The State replies that the name "brickman" is entirely neutral, implying nothing about defendant's character or any prior criminal activity in which he may have engaged, and that the nickname was probative of the issue regarding defendant's identification and that some of the State's witnesses knew defendant only by the name of "brickman." At trial, Chicago police officer Darcy testified that on August 8, 1976, he learned that an individual named "brickman" was in custody at 12th District headquarters. Furthermore, he testified that when he first saw defendant at Area 4 Homicide, he knew him only by the name "brickman." Only later did he discover defendant's true name.

Willie William also testified that on August 7, 1976, he met Sam Crawford and the "brickman" at 10:30 p.m. near Green and Adams Street. He further stated that he does not know the "brickman's" real name.

Additionally, the prosecution submits that within the context of the record, the jury could have drawn any one of a number of inferences from the nickname "brickman," all of them harmless. For example, the jury could have concluded that defendant earned his nickname because he was a bricklayer or worked in a brick yard, or because he was "tough" as a brick. In support, the State relies upon *People v. Berlin* (1979), 75 Ill. 2d 266, 268, 388 N.E.2d 412, where the supreme court stated:

> "We do not agree that questioning defendant regarding his name served to prejudice him before the jury. There certainly are, and the jury could easily have supposed, any number of innocent reasons for defendant's having adopted a different name. It is merely speculation to conclude that a jury will automatically

.associate an assumed name with a criminal background. Nothing in *People v. Dukes* (1957), 12 Ill. 2d 334, which defendant cites, requires that we hold otherwise. In *Dukes*, there was no evidence that defendant had ever used an alias, yet the State, in opening statement and closing argument, repeatedly referred to the alias that appeared on the face of the indictment and directly suggested that defendant used an alias for the purpose of concealing his identity because of a prior record of crime. (12 Ill. 2d 334, 342.) This court held that such suggestion was improper and prejudicial."

Defendant argues that *Berlin* is distinguishable because *Berlin* was an assumed name and in the instant case we have a nickname. We disagree. The court in *Berlin* stated that "[t]he questioning was relevant in that it served to clarify defendant's true identity. No suggestion was made to the jury that defendant used an assumed name because he had a criminal background." (75 Ill. 2d 266, 269, 388 N.E.2d 412, 414.) "A name is inherently a matter of repute, created and established by people's knowledge and use. An obvious way of proving a name is to show how others refer to the person whose name is in question." *People v. Escobar* (1979), 77 Ill. App. 3d 169, 179, 395 N.E.2d 1028.

■■ Here, it was not improper for the State to inquire as to the defendant's nickname and such questions were relevant and they served to identify the defendant within the guidelines stated by the trial court. The questioning had a direct causal relationship, and being relevant and nonprejudicial was properly admitted. *People v. Heard* (1980), 80 Ill. App. 3d 701, 400 N.E.2d 65.

In the respective briefs defendant has employed the term "brickman" while the State has used the term "brick man" and neither has suggested that a different meaning should attach by reason of the spelling.

The defendant next contends that the State failed to prove beyond a reasonable doubt that the defendant committed the offense with which he was charged. Defendant does not dispute the fact that Rainwater died and that his body was found near a loading dock at 844 West Adams Street, Chicago, on August 8, 1976, but he does contend that the State failed to prove beyond a reasonable doubt that he was responsible for said death. Defendant argues that the State's case was based primarily upon the testimony of an alleged eyewitness, Sampson Crawford, an admitted alcoholic, and that such testimony was replete with inconsistencies and that the inconsistencies between his testimony and the physical evidence rendered such testimony improbable and so unreasonable as to raise a reasonable doubt of his guilt.

A review of the record discloses that Crawford testified that he saw defendant drop bricks on the face of Rainwater. He also testified that

moments before attacking Rainwater, defendant had hit him in the head with a brick. After washing the blood from his face, Crawford returned to the scene and observed defendant attacking the victim.

Willie William testified that earlier in the evening he had seen defendant with two bricks in his hands. Also, Crawford stated at trial that during the time they spent together on the evening of the crime, defendant carried two bricks in his coat pocket.

Bernadette Kwak, a microanalyst, testified that certain blood stains scattered over defendant's coat, pants, and boots consisted of human, type A blood, the same type as the victim, and that the defendant's blood type was O.

Defendant states that while the fact that Crawford was an alcoholic does not in and of itself destroy his credibility, it does raise a genuine question as to his ability to perceive what he allegedly saw, his ability to accurately recall and to accurately relate to the police what he allegedly saw. His confusion as to distances between his position and the spot where defendant struck the deceased, and the dimensions of the bricks, and his failure to mention to Officer Darcy that defendant had struck him on the head with a brick, renders his story improbable and contrary to the laws of nature and normal human experience.

■■ The State maintains that the testimony of an eyewitness, who knew the defendant and who observed him attack Rainwater with bricks, coupled with the testimony of witnesses who saw defendant carrying bricks on the evening of the murder, proved beyond a reasonable doubt that defendant was guilty of murder. We agree. There was sufficient evidence to submit to the jury the issue of whether defendant was proved guilty beyond a reasonable doubt. In *People v. Horobecki* (1977), 48 Ill. App. 3d 598, 601-02, 363 N.E.2d 1, the court observed that the testimony of a single eyewitness, when positive and credible, is sufficient to support a conviction although contradicted by the defendant, citing *People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631, and further noted that such testimony is strengthened to the extent of any prior acquaintance of the defendant. *People v. McClure* (1979), 80 Ill. App. 3d 10, 398 N.E.2d 1233.

Moreover:

> "It is well established that a reviewing court will not set aside a jury's verdict unless the evidence presented at trial is so improbable or so palpably contrary to the verdict as to raise a reasonable doubt of guilt. [Citation]. The credibility of the witnesses and the weight to be given to their testimony and the inferences to be drawn therefrom are solely for the jury. [Citation]. Conflicts or discrepancies in the testimony do not destroy credibility, but rather go only to the weight to be given to such

testimony. [Citations]." (*People v. Lewis* (1979), 75 Ill. App. 3d 259, 281, 393 N.E.2d 1098.)

The evidence was sufficient to support the finding as to defendant's guilt beyond a reasonable doubt and the verdict will not be disturbed. *People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6.

For the foregoing reasons the judgment of the circuit court is affirmed.

Judgment affirmed.

McGLOON and O'CONNOR, JJ., concur.