THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JEROME ZAMP (Impleaded), Defendant-Appellant.

First District (4th Division)   No. 79-164

Opinion filed May 22, 1980.

James J. Doherty, Public Defender, of Chicago (Donald S. Honchell, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Wesley H. H. Ching, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE JOHNSON delivered the opinion of the court:

The defendant, Jerome Zamp, was charged by indictment with murder (Ill. Rev. Stat. 1975, ch. 38, par. 9—1), and tried by a jury in the circuit court of Cook County. A guilty verdict was returned and defendant was sentenced to a term of 200 to 300 years' imprisonment. He appeals his conviction, and we affirm.

Defendant contends on appeal that (1) he was not proved guilty of murder beyond a reasonable doubt because the confession conflicted with the testimony of the witnesses, and (2) the court erred in denying the motion to suppress the written confession.

Prior to trial, defendant filed a motion to suppress certain statements he made to the police after his arrest. A pretrial hearing was held on his motion to suppress. At the hearing, two New Orleans, Louisiana, police officers, John Graham and Charles Miller, testified for the State. On May 14, 1977, Officer Miller had a telephone conversation with Chicago police officer Strahlman who requested assistance in arresting defendant for a murder charge pending in Chicago. Miller was informed that an arrest warrant had been issued for defendant, and he was given information as to where defendant might be found. Later that day, Officers Graham, Miller, and Strada arrested defendant at the Society Page bar in New Orleans.

Officer Graham further testified that he identified himself as a New Orleans police officer and informed defendant he was being placed under arrest as a fugitive from Chicago. He stated that another officer advised defendant of his rights. Officers Graham and Miller both testified that defendant's condition appeared normal and there was no difficulty communicating with him. Officer Graham stated he did not believe defendant was intoxicated at the time of the arrest.

During the ride to the police station, defendant questioned Graham about the charge, but Graham did not respond. When they arrived at the police station, defendant was taken to an office where he was advised of his rights by Graham. Officer Graham testified that defendant acknowledged understanding his rights and then signed a waiver form. Officers Graham, Miller, and Strada were present when the form was executed by defendant, and defendant did not make any request for or mention that he had an attorney.

Officer Graham also testified that he later had a conversation with defendant for approximately 45 minutes. Defendant asked Graham to take some money to Laura Cambisi. Graham took the money to Ms. Cambisi the following day.

For approximately 2½ hours, Officers Graham and Miller had another conversation with defendant. During this time, defendant made and signed a written statement concerning the charge. Both officers testified that from the time defendant was arrested until the time he concluded his written statement no New Orleans police officer attempted to coerce defendant by physically assaulting him or making any promises to him.

Officers Graham and Miller were both present on May 17, 1977, when two Chicago police officers had a conversation with defendant. Officer Graham testified that when he saw defendant on the 17th there were no marks or bruises on his face or forehead nor any swelling near his ears.

Officer Markham of the Chicago Police Department stated that he read defendant his rights from a printed card, and defendant acknowledged he understood the rights and wished to answer their questions. Defendant did not tell the officers he wanted an attorney present nor did he mention that he was represented locally by Richard Stricks.

Officers Markham and Strahlman, the two Chicago police officers, talked with defendant for approximately 30 minutes. They told defendant of an oral statement given by Joseph Beto, stating that Beto was the driver and defendant was the gunman in the incident involving Dr. Wachtel. Both officers testified that no one struck or coerced the defendant during the conversation.

Defendant testified in his own behalf on his motion to suppress. He stated he was arrested at the Society Page bar in New Orleans on May 14,

1977. He had been in the bar some 6 or more hours that day. The night before, he drank 1 to 1½ quarts of Wild Turkey liquor and had taken 30 preludins. He stated he had not slept for 3 or 4 days prior thereto, due to taking preludins and drinking. He testified that he was somewhat intoxicated and not very aware of what was going on when he was arrested. Defendant stated he was never advised of his rights while at the Society Page bar, and after leaving the bar one of the officers punched him in the "solar plexus."

Defendant stated he felt intoxicated when he was taken to an interview room at the police station, and the officers had not informed him of the charge against him. He was shown and read a written statement allegedly made by Joseph Beto accusing him of being an accomplice to a murder. He further stated that the police wanted him to sign a statement similar to that of Beto's but he refused to do so. One of the officers hit him in the face. He stated that no rights were read to him and he asked for an attorney but was not allowed to make a telephone call. He further stated he was hit in the face several times before losing consciousness.

According to defendant, when he regained consciousness he had a private conversation with Officer Graham who asked whether he wished to make a statement. Defendant said he would sign anything if Graham would deliver some money to his girlfriend. He stated Graham wanted $50 and the defendant gave him the money. The defendant later spoke to his girlfriend, Laura Cambisi, and told her to telephone attorney Stricks. After he spoke with her, he was again asked to sign a statement, which he refused to do, and the officers hit him another four to six times on the head with a blackjack. Defendant subsequently signed a statement. He was then taken to the prison, booked, and placed in a tier. However, no photograph was taken at that time.

Defendant further stated that on May 16, 1977, he appeared before a magistrate for a bond hearing without an attorney. He later met with attorney Stricks at the prison and showed him the marks and bruises on his face and head. He informed Mr. Stricks that he could not avoid giving the statement. The following day, defendant had a conversation with Officers Graham, Miller, Markham, and Strahlman. He stated he was not advised of his rights by the officers but he did inform them that he had an attorney. He was told that if he waived extradition and made a statement he would be a witness in the case against Beto. They also promised him a stay in a luxury hotel with his girlfriend. Defendant identified a photograph of himself which he claimed was taken at prison prior to the beatings he received from the police on May 14, 1977.

Richard Stricks, a New Orleans attorney, also testified for defendant. He stated that he had met defendant in the early part of 1977. He had seen

defendant on a personal and a business basis several times. He was contacted by Glenn Kreel who told him defendant had been arrested. Stricks visited the defendant on May 16 and noticed the marks on his face and felt the lumps behind each ear. The defendant told him four officers had beaten him twice in connection with papers he was asked to sign after his arrest. He signed the papers only after the beatings and after being told that if he failed to sign them Beto would go free and he would be held responsible.

Stricks saw defendant the next day, May 17, 1977, in court. Stricks stated he represented defendant at the extradition hearing, but he did not recall filing an appearance and had not been retained by defendant. Stricks did not inform the court of the alleged beatings defendant received nor did he see any injuries on the defendant in the police photograph.

After arguments by both parties were heard, the court denied defendant's motion to suppress his written and oral statements.

At the trial, several witnesses testified regarding the facts surrounding Dr. Wachtel's death. Lillian Wachtel, the deceased's wife, testified that on February 2, 1977, her husband left the apartment at 7:15 a.m. At 7:30 a.m., Gus Geisel, a neighbor, came to her apartment and told her something terrible had happened to her husband. She went downstairs and saw her husband being placed in an ambulance and she accompanied him in the ambulance to the hospital. He died later that morning.

Other witnesses testified that they had seen a strange automobile parked in the lot across from Dr. Wachtel's apartment on February 2, 1977. The car was described as being an older model green Oldsmobile that was dirty and dented. The witnesses described the occupants of the car as two white males.

Gwendolyn Gilbert testified that she had known the defendant for about 9 or 10 years. When she found out defendant was in Chicago in January 1977, she called the InTown Motel and spoke with him. He went to her apartment and told her he had a contract to kill a doctor in Chicago. He showed her a piece of paper with numbers, a name, and an address written on it, but she told him she did not want to hear anything about what was written on the paper. She saw defendant often during the month of January; during one of his visits she copied the name, "Hans Wachtel," the address, "5000 East End," and a phone number from the paper he had previously shown her. She testified that she saw defendant with a gun on several occasions in January. The witness stated that when she learned of the death of Dr. Wachtel, she later spoke with defendant and asked him whether he killed the doctor. He told her, "I couldn't do a thing like that."

In May 1977, Gilbert went to the police and showed Officer Markham

the information she had copied from defendant's slip of paper. She was aware of a reward and expected to receive it after testifying.

At trial, Officer Graham read the defendant's statement in open court. The defendant stated that some 10 months earlier he was asked by Steve Fleming in New Orleans whether he was interested in killing someone in Chicago for $1500. Three months later, defendant agreed. He stated he and Fleming flew to Chicago and were taken to Dr. John Peters' apartment in a green 1973 Oldsmobile. Dr. Peters told defendant he would get $1500 for the job and gave him a gun. Fleming returned to New Orleans and defendant moved in with Dr. Peters for 3 months. After that period, he moved into the InTown Motel. Joe Beto moved in with him. When defendant told him about the planned homicide, Beto stated that he wanted to participate. After meeting Beto, Dr. Peters told them there would be a $500 bonus if the job was done by Monday. Beto and defendant went to 4800 South Lake Shore Drive to locate Dr. Wachtel's car. They found his car in a parking lot directly across the street from the apartment building. Defendant stated they staked out the area for 2 days but each day when they arrived the doctor was gone. On the third day, they saw Dr. Wachtel leave the apartment building with a friend around 7:30 a.m. Dr. Wachtel went to his own car, started it, and then removed the snow from the windshield. When the friend went to his car, Beto said, "This is it." Beto took the gun and walked to Dr. Wachtel's car. He knocked on the window; the doctor lowered the window half way and looked up at Beto. Defendant stated Beto said, "You [expletive]" and fired the gun twice. Defendant drove to the doctor's car, Beto got in, and they drove away in the green Oldsmobile. Dr. Peters gave defendant $2000 and told him to return to New Orleans.

Officer Graham stated that after defendant gave his statement he read and signed each page. Graham further testified that defendant never asked to speak to attorney Stricks. Graham stated he did not make promises to defendant nor did he tell defendant it would be in his best interest to give a statement. Attorney Stricks testified at trial substantially the same as he had at the hearing on the motion to suppress.

At the end of the trial, the jury returned a verdict finding defendant guilty of murder. Defendant appeals his conviction.

Defendant contends on appeal that he was not proved guilty of murder beyond a reasonable doubt because the confession conflicted with the testimony of the witnesses.

This court has previously held that a confession is insufficient to support a conviction if there has not been any corroborating evidence. *People v. Donalson* (1977), 50 Ill. App. 3d 678, 688, 365 N.E.2d 658, 665.

> "[B]oth the circumstances and the confession may be considered in determining whether the whole evidence proves that a crime was

committed and that the accused committed the crime." *People v. Fugate* (1979), 77 Ill. App. 3d 103, 107-08, 395 N.E.2d 1199, 1203.

At trial, several facts were elicited which corroborate the defendant's confession. Gwendolyn Gilbert testified that defendant told her he had a contract to kill a doctor in Chicago. He showed her a slip of paper which had the deceased's name and address written on it. He referred to "J.P." several times and made telephone calls to him. She saw him with Joe Beto; she saw a .32-caliber gun and the green Oldsmobile.

Defendant confessed to accepting an offer from Steve Fleming to kill someone in Chicago. He admitted seeing Dr. John Peters and being paid by him to kill a doctor. He stated Dr. Peters gave him a .32-caliber gun and the use of his green Oldsmobile in the homicide. Other witnesses testified that Dr. Wachtel left his apartment building at approximately 7:20 a.m. on February 2, 1977. They stated that a strange, older model green car was parked in the building parking lot with two white men in the front seat on that date before 7:30 a.m. Another witness testified he discovered the doctor in his car slumped over the steering wheel at about 7:30 a.m. He also noticed the window was half open.

Defendant stated he and Beto saw Dr. Wachtel leave the apartment building before 7:30 a.m. on February 2, 1977. Beto went over to the doctor's car and knocked on the window; after the doctor lowered the window and looked up, Beto shot him twice.

The evidence adduced at trial consisting of the circumstantial evidence, as testified to by the State's witnesses, and the defendant's written confession, taken as a whole, proves the crime of murder was committed and defendant participated in the murder.

Defendant asserts the evidence apart from the confession fails to corroborate his statement, since there were contradictions between the confession and the testimony on some details of the case. We find the discrepancies raised by defendant are inconsequential in view of the overwhelming consistency between the witnesses' testimony and the defendant's confession. Therefore, we hold his confession was sufficiently corroborated.

Defendant contends the court erred in denying his motion to suppress the written confession. Defendant contends his confession was induced by the alleged beatings he received at the hands of the New Orleans police officers.

The test for the admission of a confession is whether it was made freely, voluntarily and without compulsion. (*People v. Lewis* (1979), 75 Ill. App. 3d 259, 278, 393 N.E.2d 1098, 1113.) Whether a statement is voluntarily given will depend upon the totality of the circumstances. (*People v. Prude* (1977), 66 Ill. 2d 470, 475, 363 N.E.2d 371, 373.) When the trial court makes its decision, it need not be convinced beyond a

reasonable doubt; and if the trial court finds that the statement was voluntary, the ruling will not be disturbed unless it is contrary to the manifest weight of the evidence. *People v. Tanser* (1979), 75 Ill. App. 3d 482, 485, 394 N.E.2d 616, 619.

In the instant case, the trial court found that the statements by defendant were voluntarily made. A review of the evidence shows both Officer Graham and Officer Miller testified that from the time defendant was arrested until the time he finished his written statement no New Orleans police officer attempted to coerce the defendant by physically assaulting him. The two Chicago officers who testified also stated defendant's physical condition appeared good when they saw him and defendant never mentioned any physical abuse by the New Orleans police.

The only testimony given to support the defendant's claim of abuse was that of attorney Richard Stricks. Stricks testified that when he visited the defendant in the parrish prison he noticed marks on defendant's face and felt the lumps behind his ears. The defendant told him the police had beaten him in an effort to force him to sign certain papers. Even though Stricks was certain about defendant's injuries, he did not have personal knowledge of how they were inflicted.

Defendant contends that since Stricks is an attorney and an officer of the court his testimony must be held to be "eminently credible." The defendant cites several cases to support this contention, but none of the cases states that attorneys by virtue of their profession are more credible witnesses than other persons who testify.

We find the trial judge had the opportunity to observe the witnesses and was in a better position than we to determine their credibility and the weight to be given their testimony. Considering the evidence, we cannot upset the trial judge's decision that the defendant gave his confession voluntarily.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

LINN, P. J., and ROMITI, J., concur.